In the Matter of T. A. W. I.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Appellant,*

*v.*

B. S. I.,
aka B. S. B.,
*Respondent.*

Marion County Circuit Court
05C14191

Petition Number
040105IMP1

A136337 (Control)

In the Matter of T. T. R. H.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Appellant,*

*v.*

B. S. I.,
aka B. S. B.,
*Respondent.*

Marion County Circuit Court
05C14192

Petition Number
040105HAR1

A136338

182 P3d 230

Anna M. Joyce, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Daphne E. Mantis argued the cause and filed the brief for respondent.

Before Sercombe, Presiding Judge, and Brewer, Chief Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

**DEITS, J. pro tempore**

The state appeals from a judgment denying its petitions to terminate mother's parental rights to her children, TI and TH. The state argues that the trial court erred in failing to terminate mother's rights under ORS 419B.504 on the ground of unfitness. On *de novo* review, ORS 419A.200(6)(b), we reverse.

The trial in this termination case began in October 2005. For reasons that we will explain, the trial was continued twice, and the final judgment denying the petitions to terminate was not issued until April 2007. Mother was 25 years old at the time that the trial began. TI was four years old and TH was one year old at that time.

Mother was the victim of both sexual and physical abuse as a child. She lived with her mother, who had a history of drug abuse, but moved out of her mother's home at age 15. She then lived with a number of boyfriends, at least one of whom was abusive to her. Mother's life during this time period was very unstable. She moved from job to job and drank heavily to the point of blacking out. Mother married TI's father in 1999 and eventually became pregnant with TI. TI was born in January 2001. Mother admitted that, during her pregnancy, she used marijuana and that she began to use methamphetamine eight months after TI's birth.

Mother was evaluated for vocational rehabilitation purposes in May 2002 by a clinical psychologist, Dr. Shellman. He diagnosed her with Axis I dysthymic disorder; posttraumatic stress disorder; alcohol abuse, episodic; and Axis II mixed personality disorder with borderline, dependent, and passive aggressive features. Shellman believed that mother needed ongoing treatment. She was subsequently admitted to a drug treatment program at Bridgeway. Mother attended many of the education programs, but was discharged from treatment in January 2003 for her failure to comply with "nonnegotiable" house rules. Mother continued outpatient treatment until February 2003.

In September 2003, TI was removed to foster care. Mother had been found in a Salem park doing "naked yoga"

and appeared to be under the influence of drugs. TI had been in the care of mother's mother and step-father. However, the Department of Human Services (DHS) did not find this arrangement acceptable because of mother's parents' drug use. DHS was concerned about mother's mental health, her drug use, and her relationship with unsafe persons. Of particular concern to DHS was her relationship with Hart, who had a history of sexual abuse of children and substance abuse problems. Mother did not seem to understand the risk that Hart posed to her child. She also was not concerned about his drug use. It was her view that Hart's use of methamphetamine in her home would not interfere with her own maintenance of sobriety. After TI was moved to foster care, mother had a number of positive drug tests and failed to show up for a number of drug tests.

In November 2003, mother entered into a service agreement with DHS. Under the agreement, she was to participate in drug and alcohol evaluation and treatment, random urinalysis, psychological evaluation, parent training, and mental health therapy. Mother began parenting classes, but was discharged due to positive tests for drugs in December 2003. She was also assessed for drug treatment at Bridgeway, but was terminated from the program in December 2003 for lack of attendance.

In December 2003, mother underwent her first evaluation by Dr. Sweet, a licensed psychologist. He diagnosed mother with Axis I bipolar disorder with psychotic features, post-traumatic stress disorder, chronic polysubstance dependence, and Axis II personality disorder not otherwise specified (NOS) with characteristics of borderline and dependent personality disorders. Mother told Sweet that she used drugs to medicate herself for her emotional and psychological problems. She said that she did not believe that the use of these drugs affected her ability to parent. Sweet stated that he did not believe that mother was capable of parenting at that time. The following month, mother twice tested positive for methamphetamine.

In March 2004, mother completed a residential drug treatment program at Genesis Recovery Center. She was then referred to outpatient treatment at New Step. At that

time, she was pregnant with TH. She completed the New Step program just before the birth of TH in September 2004. It was reported in mother's discharge from the treatment program that she had completed all of the treatment goals and that her progress was significant. However, mother later admitted that she had used methamphetamine while she was at the New Step program and when she was pregnant with TH. When asked if she was concerned about the effects of her drug use on TH, her response was that she was trusting the Lord and the Lord heals.

Mother also admitted that she continued to use methamphetamine after TH was born and that she continued to be involved with Hart. She said that she was not concerned about any risk he might pose to her children because she had a "sixth sense" that allowed her to determine if a person was a threat to her children. She also said that Hart was not a danger to her baby because, as an infant, the child would "not be a turn-on" to him because she had "smaller vaginal parts."

Based on mother's continued drug use and her continued relationship with Hart, TH was found by the juvenile court to be within its jurisdiction immediately after her birth and placed in foster care. During this time period, TI remained in the foster care home where she had been living since being removed from mother's care in September 2003. TI's foster parent reported that TI was having some behavioral problems; she was hitting others, biting, and was delayed in social, adaptive, and motor development. Mother continued to visit TI in the foster home and, except for "terrible temper tantrums" afterward, the visits seemed to go fairly well and there seemed to be a bond between mother and child.

Mother was receiving psychiatric treatment, counseling, and drug and alcohol treatment during this time period. She seemed to be making progress and was in compliance with her service plan. The juvenile court wanted to return TH to mother's care because of her progress. Because of mother's continuing mental health issues, DHS was concerned about returning TH to mother without significant support. Mother's psychiatrist recommended 24-hour per day

in-home support for mother because of the concern about her mental health issues and her parenting skills. DHS agreed to pay for and provide exceptional services to mother to allow her to make progress with her deficiencies.

The court approved a parent mentor, Coburn, to work closely with mother and assist her in preparing to have TH returned to her. Coburn worked with mother from October to December 2004 and spent about 120 hours with her. Coburn spent a good part of many days in mother's home assisting her with parenting. TH was often present during the visits. Coburn said that she had many goals for mother that they worked on together. These goals included completing homework and tasks, showing an ability to handle daily stress while caring for her child, demonstrating that she was mentally capable of caring for her children, completing the parent-mentor intervention, caring for daily personal matters, and getting her home ready for TH to return. Coburn ultimately concluded, however, that mother failed to complete a single goal. Coburn said that mother tended to get "overly upset" over small matters, and was often argumentative and did not follow suggestions. Mother later admitted that she was using methamphetamine during this time. Coburn also said that she tried to talk with mother about the risks posed by her association with Hart, but that mother continued to believe that he did not pose a risk.

Mother was again evaluated by Sweet in February 2005. Sweet stated that mother was agitated and that she had difficulty focusing and paying attention. Sweet later learned that mother had been using methamphetamine at the time of this evaluation. He diagnosed her at that time with Axis I bipolar disorder severe, with psychotic features; post-traumatic stress disorder; chronic polysubstance dependence in full remission; and Axis II personality disorder NOS with characteristics of borderline and dependent personality disorders. Sweet testified that even though mother had completed a number of services, she remained unstable and that she had not improved her parenting ability. He did not believe that she was capable of parenting a one-year-old and a four-year-old at that time. Sweet testified that, even if mother had been clean and sober for seven months as she claimed, she would need to be clean and sober

for another year and one-half in order to demonstrate recovery.

Sweet explained that mother's personality disorder contributed to her difficulties with parenting because, at least partly as a result of her mental health problems, "she does not have adequate empathy" for the children and she does not understand how to meet their needs. According to Sweet, mother's focus is on getting others to meet *her* needs. Sweet stated that, if either of mother's children had special needs, the additional stress of caring for those special needs would likely increase the symptoms of mother's mental disorders and make it even more difficult for her to be an adequate parent.

In February 2005, DHS sent mother a Letter of Expectations asking her to participate in visits, mental health counseling, and psychiatric treatment, to discontinue her relationship with Hart, and to provide proof that she could maintain a stable home for the children. Also, in February 2005, DHS had Freilinger, a counselor and play therapist, conduct an attachment assessment of TI and, in April 2005, Freilinger evaluated TH. The purpose of that evaluation was to assess the children's attachment to their caregivers and to provide guidance with regard to the children's future placement.

Freilinger found TI to be controlling, bossy, rough, physically inappropriate, and sometimes violent with other children. TI refused to eat at times and suffered from chronic nightmares. Freilinger said that TI would not make eye contact with her for some time. She said that she found this "striking," because most children will make eye contact unless they are "shame-filled or scared or traumatized." Freilinger observed that TI did not seem to have a secure emotional attachment with the person who was her foster mother at that time. Freilinger stated that, in her view, TI would have a "very difficult time" transitioning to new placements. According to Freilinger, each time a child is moved to a new placement, it creates a potential psychological risk for the child.

Freilinger also assessed TH in April 2005. TH was about six months old at the time. Freilinger did not have similar concerns about TH and felt that she was securely attached to her foster mother. She was, in fact, concerned to learn that DHS was looking for a different permanent placement for TH. However, she believed that TH was capable of bonding with a subsequent caregiver. It was Freilinger's view that a person would need "exceptional parenting skills" to parent TI and TH. She said that these children would need a parent that was highly disciplined and structured and provided a high level of predictability. Freilinger explained that the children's caregiver should have a good understanding of TI and TH's psychological needs because it was highly likely that, because of their biology and the trauma that they had been through, they could face psychological problems.

In March 2005, mother entered a residential treatment program, Her Place. The program supervisor at Her Place had concerns about mother's behavior in the program. Although mother claimed that she had not had any recent sexual encounters, she told the staff that she was pregnant, but that her pregnancy was a miracle from God. She was disruptive in group meetings and did not do her chores or other tasks. She was often explosive and angry and lost her temper. The staff at Her Place was concerned about her behavior. They were particularly concerned because there were children staying at the treatment center, and the staff members thought that mother's behavior was inappropriate in front of the children. Mother also continued to have contact with Hart despite being told by the staff that this was counterproductive to getting her children back. Mother said that she needed him financially.

Mother was finally asked to leave the program in May 2005. Mother's discharge report listed her prognosis as "poor," and it was recommended that she complete an in-house program. Mother then went to an in-house program for more intensive treatment, but she was discharged after 10 days for failure to comply with program rules.

In June 2005, mother began living at the Oxford House, a house for recovering addicts. Mother had difficulty controlling her temper there and, because of that, she was

put on a "disruptive behavior contract." According to Lewis, the president of the house, mother followed general house rules, kept her room clean, and met her financial obligations. It was Lewis's view, however, that mother did not have the maturity at that time to parent two small children. Mother continued to have difficulty with her behavior at the house and was expelled from the house in August 2005 for failure to comply with the "behavior contract."

In August 2005, mother contacted her caseworker, Wenig, and said that she wanted her children returned to her. Wenig said that mother looked "pretty good" at this time and that she appeared to be making progress. Mother had a job, stable housing, and was seeing Dr. Suckow, a psychiatrist. Wenig asked mother if she was prepared to have the children right away. Mother responded "not today." She explained that she had a very busy schedule. Mother told Wenig that her goal was to parent TI by October 10, the date of the termination trial. Wenig said that she explained to mother that the children had been in foster care for some time now and that it was "critical" that mother step up right away because DHS was preparing a transition plan and seeking an adoptive family. Mother told Wenig that "she just wasn't going to be able to adjust her schedule right now." Wenig testified that mother did not appear to understand the potential traumatic effect on the children if they were placed in a potential adoptive home, only to be removed back to mother's home later when she was prepared to parent them. Wenig said that mother had no plan for transitioning the children back to her.

In October 2005, the termination trial began. Mother testified that she was then ready to have the children returned to her. She was living with a friend from church at that time. She acknowledged that she needed to get an apartment and knew that the RENT program would help her with that. Mother was going to school and had a job working 11 hours a week. Mother said that she had ended her relationship with Hart and that she had come to believe that he probably did sexually abuse someone. She also agreed that she could benefit from ongoing mental health counseling. Wenig testified that visitation between mother and the children was positive. Based on this testimony, the trial court decided to

continue the trial for six months to assess whether mother would be able to maintain her present stability.

After the continuance of the termination trial in October, Wenig and mother set up another service agreement for mother. The agreement included details of the requirements that mother needed to meet to obtain the return of her children. Mother was required to find housing, provide DHS with a weekly statement of her income, and meet weekly with Wenig. Mother was to continue with her mental health counseling and to refrain from arguing with Wenig. Mother did begin mental health counseling and the treatment provider, Nelson, believed that mother made progress. Wenig reported having difficulties getting mother to cooperate. Mother apparently became "increasingly combative" and difficult to work with. Because of this conflict, Wenig and mother ceased meeting on a weekly basis.

In February 2006, mother was evaluated by Sweet for the third time. Sweet conducted additional personality tests and found mother to be more defensive than previously. She told him that she was having difficulty coping with her everyday life and the stresses and problems that she faced. Sweet concluded that mother continued to suffer from a personality disorder with borderline and dependent features. He determined that she no longer seemed to have a bipolar disorder and opined that her symptoms of that disorder may have been caused by her methamphetamine use. Sweet said that she continued to suffer from post-traumatic stress disorder.

Sweet believed that mother had made progress, but that her post-traumatic stress disorder remained "chronic" and "fairly consistent." He expressed concern that that condition would result in an unstable environment for the children and that the lack of consistency and security could have an adverse impact on the children. Sweet explained that mother's personality disorder is a deeply embedded problem that makes it difficult for her to establish relationships and get along with people. He said that such conditions are difficult to treat, in part because the person believes that she is right and that everyone else is wrong. Sweet predicted that effective treatment of mother's personality disorder could

take a minimum of two years or longer. He also expressed serious concerns about mother's ability to understand the children's developmental needs.

In May 2006, DHS had TI evaluated by a child psychiatrist from the Children's Program, Dr. Giesick. The testing indicated that TI had average or high average intelligence. It was Giesick's observation that TI's foster parents were important grownups in her life. TI told Giesick that she had seen her mother use drugs. She said that she wanted to live with her mother. Giesick said that TI had exhibited some sexualized behavior. She diagnosed TI as suffering from "attachment" problems. TI apparently showed confusion about who her parents were and expressed concern about abandonment. Giesick said that TI had a tendency towards aggression, cruelty to animals, and indiscriminate attachment to strangers.

Giesick also diagnosed TI with adjustment disorder with anxious moods. She testified that she thought that TI had experienced "traumatic or destabilizing" events. TI apparently was extremely fearful of public restrooms and expressed concern about having a "forever home." It was Giesick's view that TI had experienced neglect at times during her life and that she may have been sexually abused.

It was also Giesick's opinion that the instability in TI's life had had an impact on TI's development and behavior. She explained that the instability likely resulted in her present need for "attachment work." Giesick was concerned that TI be able to "put down roots." In her view, if TI has some stability and consistency in her life, she will be able to learn to trust her caregivers and attach to her school environment. Giesick believed that TI needed permanency as soon as possible; that if she does not have stability soon, she could develop a full reactive attachment disorder. Giesick expressed concern that a caregiver with a personality disorder would not be able to provide the necessary stability for a child like TI.

The termination trial resumed in June 2006. Mother testified that she had previously lied about her drug use, but that she had stopped using drugs in March 2005. She also said that she had discontinued her relationship with Hart.

Mother admitted that, despite the requirement in her service agreement that she not engage in new relationships with men, she had had a relationship in January 2006 with an old boyfriend. She characterized this as a "behavioral relapse." Mother was living in a home that she was renting from her church. The church was subsidizing her rent, and the church members were supporting her in other ways. She was attending school and had part-time employment. Mother testified that she believed that she had done everything required of her and that both children could be returned to her care.

Suckow, a psychiatrist who had been seeing mother since April 2004, testified that he had prescribed medications for mother after the birth of TH and that he continued to see mother on a monthly basis. He eventually took her off the medications. Suckow testified that his diagnosis of mother in June 2006 was that she continued to suffer from an anxiety disorder, post-traumatic stress disorder, and "off and on" chronic substance abuse. He did not diagnose her with a personality disorder, but he said that he did not have reason to disagree with Sweet's Axis II diagnosis.

Suckow testified that, while mother had improved, his main concern in regard to mother's parenting was her high potential for relapse, given her anxiety and post-traumatic stress disorder. He said that if mother did have a personality disorder, that such a condition could take years to treat. Suckow stated that mother is defensive and does not have a clear understanding of her needs. He explained that she was in the early phase of treatment and relies heavily on support systems to get her through the day. He expressed concern that mother did not really understand how to be a mother. Suckow stated, "She goes through the motions and she wants to do it right, but just doesn't know how." Suckow stated that he did not believe that mother, particularly as a single parent, could successfully parent two children. Suckow said that, with significant help, mother might be able to be a minimally adequate parent, but that at that time— June 2006—he did not believe that she was able to be a minimally adequate parent for the children.

Sweet testified at the continuation hearing that he believed that mother had made progress with her drug

dependence. He remained concerned, however, about her mental health issues, which he said were "chronic" problems, and opined that it was going to take a long time to resolve those problems. Sweet was especially concerned about mother's ability to care for a "high needs" child. Sweet said that mother did not seem to know how to meet her children's needs and that she lacked empathy. He suspected that attempting to care for such a child would cause mother to "unravel." He did not believe that mother could handle that in the foreseeable future.

Stephens, a substance abuse counselor with New Step, testified that mother had been involved in outpatient programs at New Step. He said that she had done well in the program and that he believed her prognosis for remaining clean and sober was "really good." He said that he did not believe that mother had any mental health issues.

Nelson, a clinical social worker at West Salem Mental Health Clinic, counseled mother from October 2005 to March 2006. He testified that mother demonstrated a willingness to learn new information and skills and that she made progress on managing her anxiety. He said that she was engaged and very motivated. Nelson did express concern about mother being unemployed at a time when she was trying to regain custody of her children.

Several persons from mother's church also testified. Those witnesses expressed the view that mother's stability had increased and that they had not seen any "concerning" behavior. None of the witnesses, however, appeared to have had much opportunity to observe mother in her role as a parent. One of her friends, in fact, said that she had never seen how mother handles a lot of stress, which, as the friend explained, "will be in her lap if she has the children." She said that she had no knowledge as to how mother might handle that.

Wenig, mother's caseworker, testified that mother was offered additional parenting mentoring services in February 2006. Mother apparently refused those services because she did not want to work with parent mentor Coburn again. She told Wenig that her plan for the children was to "not do much at all, if anything, with [TH]; that she would

really focus on [TI]." Mother explained that by doing that, TH would become jealous and then decide to engage with mother. Wenig was concerned about mother's lack of interest in the children; in particular, her lack of interest in TH. She said that, when she tried to tell mother about TH's sleep disturbance problems, mother said, "Whatever about [TH]. Let's just talk about [TI]." Wenig said that mother often was angry with her and acted frustrated with adjustments that DHS wanted her to make. Wenig saw mother's involvement with her church as positive.

The children's foster mother also testified at the June 2006 trial. The children were placed together in that foster home a few months before the beginning of the termination trial, and the home is available as an adoptive placement. The foster mother testified that TI was continuing to have nightmares and that, when she had them, she often screamed out in the night. She testified that TI engages in some unusual and aggressive behaviors. An example that she gave was that TI told her foster father that she loved him and then spit in his face. She also was aggressive toward the family pet to the point that the family had to get rid of the pet. The foster mother said that TI had few boundaries with strangers, particularly men. She was very dependent and reacted strongly when the foster mother would leave the home. TI told the foster mother that she had four mothers and that mother was "mommy with the long hair."

The foster mother testified that TH has had difficulty sleeping for more than 10 or 20 minutes at a time. When she wakes up, she is often screaming. On one occasion, she screamed so much that she broke blood vessels in her eyes and along the back of her neck.

The trial was continued again until December 2006. Between the time of the June and December portions of the trial, mother had had five or six different jobs. Mother was fired from one of the jobs for "arguing and attitude." During this time period, Wenig, mother's caseworker, received a report that TI had told someone that a person had touched her "private parts." When Wenig told mother about this, mother was concerned that, if TI identified Hart as the person who had touched her, it would reflect poorly on her.

Wenig testified that mother made some progress during this time period in the stability of her life, but that she remained concerned about mother's mental health issues.

The trial court issued its decision in April 2007. The court found that mother suffered from post-traumatic stress disorder and a personality disorder. The court also concluded that mother had failed to meet most of DHS's expectations. The court stated that it relied extensively on Sweet's and Suckow's testimony, which, in the view of the court, had "great" credibility. The court cited, in particular, the testimony of these experts in which they expressed concern about mother's present ability to parent. Nonetheless, the trial court held that the state did not meet the statutory burden of showing that mother's conditions were seriously detrimental to the children at the time of trial. Notably, and somewhat inexplicably, the court went on to find that "[t]he damage that has been done to these children, in particular the older child is both extensive and overwhelming."

The state appeals the trial court's denial of the petitions to terminate mother's parental rights, arguing that the trial court erred in determining that mother's conduct and conditions were not seriously detrimental to the children and in denying the petitions. For the reasons that we discuss, we agree and reverse the trial court's decision.

ORS 419B.504 governs the court's consideration of a petition to terminate parental rights. In its decision in *State ex rel SOSCF v. Stillman*, 333 Or 135, 36 P3d 490 (2001), the Supreme Court explained the test that must be applied to determine if a petition to terminate parental rights should be granted:

> "First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the

parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.' "

*Id.* at 145 (quoting ORS 419B.504).

As the court further explained in *Stillman*, the focus of both parts of the test for determining unfitness

"is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child."

333 Or at 146. As this court explained in *State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 180 P3d 69 (2008), the inquiry whether a parent's conduct or condition has had a seriously detrimental effect on the child is meant to be "child specific" and calls for testimony in psychological and developmental terms relating to the particular child. *F. W.*, 218 Or App at 456.

The state is required to prove unfitness by clear and convincing evidence. Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003). Further, the state is required to prove that the parent is unfit at the time of the termination hearing. *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006).

The critical issue in this case, as is true in many termination cases, is whether, after considering all of the circumstances of the case, including mother's fairly lengthy history of drug dependency, mental health, and behavioral problems, mother was unfit *at the time of trial*. The evidence shows that mother has had a history of substance abuse that has seriously affected her life, in particular, her ability to parent. Her psychiatrist, Suckow, who had worked with mother for some time, characterized her as having an "off and on" chronic substance abuse problem. Mother claims that she has had a fairly lengthy period of sobriety. That may be true. However, it is somewhat difficult to determine how long

mother's sobriety actually has lasted because her claim that she has been sober for some time is based in large part on her own report. Mother has shown a pattern of adamantly claiming sobriety, and then later admitting that she was lying about it. Due to her history of substance abuse, mother certainly faces some risk of relapse, as the experts who evaluated her have indicated. However, it does appear that, at the time of trial, she had made progress with her drug dependence. If that were the only condition that allegedly rendered her unfit, the evidence of that condition alone would not be such to establish that she was unfit at the time of trial.

As this court has explained, however, all of a parent's conduct and conditions must be viewed in combination in determining whether a parent is unfit. *See, e.g., State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 49, 144 P3d 943 (2006); *State ex rel SOSCF v. Mellor*, 181 Or App 468, 476, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003). Mother's substance abuse issues must be viewed together with her mental health and other behavioral issues.

With regard to mother's mental health issues, the evidence establishes that mother's conditions are serious and long-term and that her mental health issues have significantly interfered with her ability to achieve stability and consistency in her life, and, consequently, to be a minimally adequate parent. Similar to the circumstances in *State ex rel Dept. of Human Services v. R. N. L.*, 218 Or App 188, 180 P3d 704 (2008), the evidence here establishes a nexus between mother's conduct and her inability to become an adequate parent to her children. As in *R. N. L.*, the experts in this case opined that, due to mother's mental conditions, she does not seem to have the ability to place her children's needs above her own. Further, the evidence shows that mother's mental health conditions have interfered with her ability to understand and meet her children's needs and to use the assistance that she has been offered to learn to improve her parenting skills in order to be able to meet her children's needs.

Since mother has been involved with DHS, she has been through a myriad of treatment and support programs

that have been directed at her mental health, drug dependency, and behavioral issues, and her need to improve her parenting skills so that her children could be returned to her. Mother has had limited success at times in these various programs. She appears to have made improvements in some areas of her life, as discussed above. However, more often than not, she has been dismissed from the programs because of her inability to follow the rules and her combativeness and has not benefitted from the treatment and programs. Her pattern has been to return to her old behavior following her departure from the programs.

Mother has struggled in her relationships with others, in particular, persons who are trying to assist her. She has consistently displayed obstinate, aggressive, defensive, combative, and immature behavior in dealing with others in her life. Mother's employment, personal stability, and ability to parent have suffered greatly because of her mental health problems. Despite sporadic improvement, at the time of trial, many of the mental health issues and behavioral difficulties that affected mother's ability to parent remained. Significantly, as the trial court recognized, the experts who had treated and evaluated mother for her mental issues over a considerable time period continued to believe that, at the time of trial, she was not able to be a minimally adequate parent. They also expressed the view that effective treatment of her condition that would allow her to become a minimally adequate parent would take a long time.

We believe that mother's mental health conditions and her behavior are conduct and conditions that justify termination under ORS 419B.504. As discussed above, however, under our case law, that is not the end of the inquiry. In order to determine if mother's conduct and conditions render her unfit as a parent for purposes of the termination statutes, we must consider the detrimental effect of her conduct and condition on her children. The more serious the adverse affect on the children, the more likely it is that the parent's conduct will render him or her unfit. *Simmons*, 342 Or at 96. As noted above, the trial court found that the damage to the children, especially TI, was "extensive and overwhelming." Nonetheless, the court concluded that mother's conditions were not

seriously detrimental to her children and, therefore, the petitions for termination should be denied. We disagree with that conclusion.

The evidence here is clear and convincing that mother's conduct and condition have had and continue to have a seriously detrimental effect on the children. As the evidence regarding TI's behavior and development demonstrates, the instability and inconsistency in her life has had serious effects on TI and has put her at great risk for further damage if she is exposed to continued instability. Both children have been evaluated at different times since they have been in foster care. TI has exhibited aggressive and anxious behavior and has been diagnosed with an adjustment disorder and attachment concerns. Giesick, a child psychiatrist with the Children's Program, who evaluated TI in May 2006, before the second phase of the termination trial, said that she was a child "who is in need of some intensive attachment work." She stated that TI needed permanency as soon as possible and that

"I can't, in good conscience, recommend that there be another disruption in placement. She—it's my strong opinion that she needs to remain where she is and to continue to develop that attachment to the prospective adoptive family. * * * It's rare for me to state it so clearly, but I'm very concerned about her confusion."

As to TH, she has been in foster care since her birth and has not experienced the degree of instability in her life that TI has. Nonetheless, she has displayed signs of anxiety, including an inability to sleep and nightmares.

The described evidence establishes that the children's problems in this case are severe and that both children are fragile and in need of stability. The evidence also demonstrates that the detriment to the children from mother's conduct and conditions rises to the level contemplated by the legislature in ORS 419B.504 so as to provide a basis for concluding that mother is unfit.

We also conclude that the evidence establishes that reintegration into mother's home is improbable within a reasonable time due to conduct and conditions that are not

likely to change. In order to justify the denial of the petitions for termination where it has been shown that mother is unfit, it must be established that mother can make lasting changes that will allow her to provide a safe and stable home for her children within a reasonable time. Under ORS 419A.004(20), a "reasonable time" is a "period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments."

There is no doubt that both of these children have special needs that the experts believe require a parent who is able to provide structure and consistency. The evidence also shows that, at the time of trial, mother was not yet able to provide the needed structure and consistency that would allow her to be a minimally adequate parent to these special needs children. None of the experts believed that mother was presently able to parent the children. This is not a case such as *State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 126 P3d 758 (2006), where a parent has progressed significantly in his or her ability to understand and meet the children's needs. Although mother has shown progress in some areas in her life, the evidence has shown that she has made very little or no progress with respect to understanding the needs of her children and how to begin to meet those needs. Both the testimony of the experts who were familiar with mother and her conduct and conditions, as well as the evidence of her conduct over the years, support the conclusion that mother will not be able to adjust her conduct and conditions within a reasonable time in view of the time that has already elapsed and the special needs of the children.

As we recognized in our recent opinion in *F. W.*, our case law does not authorize an indefinite number of opportunities for parents with serious substance abuse and mental health conditions to engage in cycles of treatment, relapse, and recovery while their children remain in the foster care system. 218 Or App at 461. At the time of the completion of the trial in this case, the children had been in foster care for almost three and four years, respectively. They have spent most of their young lives in foster care and, during that time, despite continuous services by DHS and others, mother has never been able to remain sufficiently stable to be able to parent them. When TH was with mother for a short time when

the juvenile court believed that a plan to return TH to her should be developed, mother was completely unable to benefit from the parenting expert who spent over a hundred hours with her in her home.

As we explained in our recent decision in *F. W.*, ORS 419B.470(2) gives DHS no more than 12 months after a child is found within the jurisdiction of the court under ORS 419B.100, or 14 months after the child is placed in substitute care, whichever is the earlier, to conduct a permanency hearing. The statute evinces the policy objective that children not be left indefinitely in a placement limbo, and it also reflects a child-centered policy orientation to the dependency process. There is clear and convincing evidence in this record that demonstrates that mother is unfit by reason of conduct or conditions that have had a seriously detrimental effect on the children. The evidence also establishes that the children have been in foster care for a good part of each of their lives and that reintegration into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change. There is clear and convincing evidence that termination of mother's parental rights is in the children's best interests.

Reversed.