Argued and submitted August 17, reversed and remanded November 30, 2016

In the Matter of E. J. J.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. J. J., Jr.,
*Appellant.*

Marion County Circuit Court
15JU00076; A161222 (Control)

In the Matter X. T. J.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. J. J., Jr.,
*Appellant.*

Marion County Circuit Court
15JU00077; A161223

In the Matter of E. M. J.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. J. J., Jr.,
*Appellant.*

Marion County Circuit Court
15JU00079; A161225

387 P3d 450

Ginger Fitch argued the cause and filed the brief for appellant.

Keith L. Kutler, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## DUNCAN, P. J.

Father appeals judgments terminating his parental rights with respect to his three sons, EM, EJ, and X. The trial court ruled that father's rights should be terminated on the basis of unfitness, particularly because of father's personality disorder, anger management problems, housing instability, and failure to make a lasting adjustment to those conditions and circumstances. On *de novo* review, ORS 19.415(3)(a), we find that the Department of Human Services (DHS) has failed to prove by clear and convincing evidence that father's conduct or conditions are seriously detrimental to his children; accordingly, we reverse the trial court's judgments.[1]

## I.  BACKGROUND

A.  *Procedural History*

The parties generally agree on the chronology of events leading to the termination proceedings. Father and mother have three children together: twins EM and EJ, who were born in December 2011, and X, who was born in May 2013. Mother also has three other children from another relationship: twins EB and A, born in April 2004, and G, born in July 2007. Before the state's most recent involvement with the family, all six children were living with mother and father.

DHS became involved with the family in May 2013, when X was born with methadone and marijuana in his system. The children, including X, remained with mother and father at that time, but DHS continued to monitor the case. Then, in July 2013, mother and father separated. The three youngest children, EM, EJ, and X, continued to live with mother, but the three oldest children went to stay with their paternal grandparents because mother was struggling to care for all six children and find suitable housing.

The following month, on August 9, 2013, X was rushed to the emergency room by his babysitter. X was

---

[1] Mother's parental rights to EM, EJ, and X, as well as her parental rights to three children from a previous relationship, A, EB, and G, are the subject of a separate case, also decided this date. *Dept. of Human Services v. L. D. K.*, 282 Or App 510, 387 P3d 462 (2016).

wheezing, his body was cold, and he appeared to be having a seizure. He was admitted at the hospital for failure to thrive and a saline imbalance, which produced the seizures.[2] On August 12, 2013, DHS filed a petition to take jurisdiction over X on the grounds that mother had a substance abuse problem that, left untreated, interferes with her ability to parent; that X was diagnosed with nutritional neglect and that mother needs the state's help to learn the skills necessary to adequately care for X; and that father lacks suitable housing for X and needs the state's assistance to obtain suitable housing.

Shortly thereafter, all six children were taken into protective custody after medical examinations of the younger twins, EM and EJ, revealed fractures believed to be indicative of child abuse. In its petition to take jurisdiction over EM and EJ, DHS alleged, in addition to allegations regarding mother's substance abuse and father's housing, that the children had "suffered injuries including an untreated diaper rash, bruising and a metaphyseal fracture that is indicative of child abuse."

It was subsequently determined that the "fractures" on EM and EJ were actually birth defects, not the result of child abuse. However, in November 2013, mother and father admitted other bases for jurisdiction: Mother admitted that she had a substance abuse problem that, left untreated, interferes with her parenting, and father admitted that he lacked suitable housing for the family. Thus, in November 2013, the court entered jurisdictional judgments with regard to all three of mother and father's biological children. Meanwhile, the three oldest children, EB, A, and G, were returned to their biological father and, later, foster care.[3]

Mother and father separated again in June 2014, and, by July 2014, father's visits had been canceled because he missed three in a row. On July 30, 2014, DHS filed new

---

[2] X's pediatrician, Dr. King, explained at the termination trial that an elevated sodium concentration can result when a child is given water or overly diluted baby formula rather than breast milk or properly mixed formula.

[3] The oldest three children were placed in foster care because their biological father violated conditions of his probation and was incarcerated.

petitions for EM, EJ, and X that alleged additional bases for jurisdiction with regard to father. The petitions alleged that each child is "in need of specialized medical treatment and oversight that the father cannot or is otherwise unwilling to provide"; that, "[d]espite having been offered services to address the father's parenting problems that interfere with his ability to safely parent the child, he has been unable to remedy the problem"; and that "[f]ather has an anger control problem and mental health issues that, left unremediated, interferes with his ability to safely parent the child." In October 2014, father did not appear for the jurisdictional hearing, and the court entered jurisdictional judgments on those petitions.

In December 2014, the court changed the permanency plan from reunification to adoption for EM, EJ, and X. Father, after being absent for a period of time, showed up for that hearing and requested reinstatement of visits. Father resumed visits with EM, EJ, and X in late January 2015.

By the time that his visits resumed, DHS had filed a petition to terminate his parental rights to his three children. The petitions alleged as follows:

"The parental rights of the father to the above-named child should be terminated under ORS 419B.504 on the grounds that the father is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change, including, but not limited to the following:

"(a) Exposure of the child to domestic violence.

"(b) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.

"(c) Failure to present a viable plan for the return of the child to the parent's care and custody.

"(d) Failure to learn or assume parenting skills sufficient to provide a safe and stable home for the raising of the child.

"(e) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the

parent incapable of providing care for extended periods of time.

"(f)  Physical and emotional neglect of child.

"(g)  Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.

"(h)  Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

## B.  *Termination Proceedings*

The termination trial began on June 10, 2015, and, after two days of testimony, was continued until September 28, 2015. At the trial, the parties presented the following evidence, much of which focused on DHS's theme that father was angry and potentially abusive, including toward DHS, which hampered the state's efforts to help father attain the parenting skills and stability necessary for reunification.

### 1.  *Father's mental health, anger issues, and use of discipline*

#### a.  Disclosures of "excessive discipline"

Some of DHS's initial concerns about father's anger and mental health issues stemmed from comments made by two of mother's older children, A and EB, during their mental health assessments. During her assessment, A expressed dislike for father and how he treated them when they were younger. A's assessment states, "Past concerns related to [father] using excessive physical discipline toward [A] and her siblings," and A and her siblings expressed that they did not want to live in mother's home if father were there as well. EB likewise had reported that father would often spank him and punished him for behaviors like taking food from a friend or accidentally urinating on the toilet seat.

#### b.  Psychological evaluation

After DHS filed the amended petitions to include allegations regarding father's mental health and anger issues, father was ordered to submit to a psychological

examination, which took place in August 2014. The examining psychologist, Dr. Cook, found that father had "borderline intellectual functioning" and diagnosed him with a depressive disorder not otherwise specified, a generalized anxiety disorder, and an antisocial personality disorder.

Cook noted that father was a "challenging client" who was "openly hostile to DHS." Father blamed DHS for many of his struggles, expressing the view that "he lost the [Temporary Assistance to Needy Families] grant when the children were removed and in the aftermath has struggled to pay bills, has been evicted twice, and has had to find a job." At the same time, father was "candid in admitting fault" with regard to his parenting skills. Father admitted that he "yelled too much, was impatient, and that he sometimes scared his children." Cook also reported that father admitted "that he took discipline too far at times but claims that he was never physically abusive."

Cook ultimately opined that father "expresses a genuine love and attachment for his 3 young sons [EM, EJ and X], but his cognitive and psychological issues impair his abilities and manifest in parenting skills which place his children at risk of further harm." As part of his August 2014 evaluation, Cook had recommended that father sign up for parenting classes, a domestic violence assessment, and drug abuse screen; he also recommended mental health counseling and consistent visitation with the children.

c.  Domestic violence assessment and DV status report

The state also offered testimony from Dr. Carter, who conducted a domestic violence assessment in March 2015. Following the assessment, which showed that father scored high with regard to "psychological violence," father participated in treatment with Carter. Father was continuing that treatment when trial began in June 2015, including preparing for a "full disclosure polygraph" scheduled for August 2015. However, in late July 2015, father was terminated from the program for "continued drug use" (marijuana) and "withdrawing his consent to share progress notes and polygraph results with the family court system."

When the trial resumed in September, Carter testified that father had been making progress, having attended 8 of the 36 classes in the program; however, Carter also testified that father had made concerning disclosures related to abuse during his preparations for the polygraph. For instance, in response to a question about past physical violence, father "talked about beating up a man in front of his family; this man apparently walked up and laid hands on his child."

Carter further testified that father had "no plan" to eliminate all forms of violence in his life. According to Carter, father had told her that he was only willing to curb his violent tendencies to get his children back, and that he would otherwise revert to his previous ways.

d.   Father's testimony

Father, during his testimony at the termination trial, acknowledged that he had used physical discipline on the children, but he testified that "[t]he only time I have ever spanked my children was severe, severe incidents where they'd be either hurt somebody else or they've done—stole something or anything like that, you know."

Father also acknowledged that he had a violent past and had been confrontational, but he testified that he had not had any contacts with police for the past 15 years and denied ever being physically violent toward mother or any women. With regard to the incident in which father beat up a man in front of his family, father testified that, as he was leaving a park, someone who lived "in the apartment complex" and looked "a little drunk" had threatened and bumped into father while he was holding EJ, who was still a baby. Father testified that he handed EJ to mother and then beat up the man, which he characterized as "neutraliz[ing] that threat."

e.   Popov testimony

Popov, a clinical social worker who had been working with father since June 2015, also testified about father's anger issues. Popov testified that father's treatment goals "absolutely" revolve around "his emotional regulation and anger

and violence." He explained that, when under stress, "once [father] crosses a certain threshold it becomes very hard for him to delineate * * * what's the right response to this."

Popov was asked about prior statements in evidence that father had made about getting into "bar fights" and "fight[ing] guys in the streets all the time." Popov stated that he had heard father "make similar statements when he was emotionally pretty disorganized and upset about an issue," because talking about getting into fights is his "go to, verbal anxiety identification statement." Popov testified that he was working with father to find strategies that would help him to a "calm state so that [father] can actually solve the problem instead of creating more problems." Yet Popov was also asked, "Do you think his violence has him so impaired he can't parent or he'd be unsafe?" Popov answered, "I don't think he's unsafe."

### 2. Father's engagement with mental health and counseling services

DHS presented evidence that father's engagement with mental health and counseling services was limited, at best. Without belaboring the matter, DHS offered evidence that father's efforts to address some of the issues that were identified by DHS—specifically, his mental health and anger issues—were marked by distrust of DHS and poor follow through. Father did not engage in services until February 2015, and then, after engaging in domestic violence services with Carter, he was terminated only a quarter of the way into the program for failing to comply with the provider's rules regarding marijuana use and disclosure of information. Father offered evidence that he had successfully engaged in services with Popov, who testified that he and father were "making headway; more than I expected. And his commitment is more than I expected. I really didn't think I'd hear from him so, you know, it was a pleasant surprise to have him call and schedule appointments." However, that relationship did not begin until after the termination trial had already begun, and Popov's availability was limited because of health issues.[4] Moreover, there was ample

---

[4] Because Popov was suffering from health problems, he was not available to provide counseling services between September 8 and October 2, 2015.

evidence presented that, when father did engage in domestic violence services, he continually asserted that the services were unnecessary.

### 3. *Father's visitation and parenting skills*

The state put on evidence that father's engagement in visitation and parenting classes was limited in the early stages of the case. As previously noted, father missed three consecutive visits with all six children, and his visits were canceled in July 2014; he did not seek to resume those visits until the change of the permanency plan in December 2014, and his visits did not actually resume until late January 2015.

Father, however, offered evidence that, after reuniting with mother and seeking to resume visitation in late 2014, he then made an effort to engage in a parenting class along with mother. Father contacted Family Building Blocks, a service provider, and the family worked with a visitation coach, Ruks, from April through July 2015. Although father wanted to continue working with Ruks, DHS believed that the family would be better served by a different parenting class, and the family did not engage with their next parenting coach, Crank, until September 18, shortly before the termination trial resumed.[5]

The reports from the parents' visits, as recounted at trial, present a mixed picture. Tavernier, a DHS caseworker who observed but did not directly supervise the visits, testified that father "does not intervene when the children are—I shouldn't say doesn't—occasionally intervenes when children are doing something unsafe," and that "a lot of the unsafe behaviors are laughed about or almost encouraged by that." She testified that she "had definite concerns observing the visits" in light of "an overall lack of consistency in follow-through with managing behaviors that the children

---

[5] The parties offered conflicting evidence with regard to the reason for the delay in getting a parenting class in place at that point. DHS presented evidence that it was trying to get mother and father into a Parenting Connections class rather than therapeutic visitations, and that mother and father declined to participate in that class. Mother and father, meanwhile, presented evidence that they had wanted to continue working with Ruks and the department simply failed to renew the contract with Family Building Blocks.

have exhibited. I've seen a lot of laughing off negative behavior between Mom and Dad, thinking it was really funny and cute." As an example, she testified that the children were "walking on chairs that were unstable, that were not safe for them and either—neither parent said a word, addressed it at all, or several times later they would say—they would be told things like, 'Be careful,' but were not asked to sit down or get off of the chairs inappropriately."

DHS workers also referred to an incident during a visit in which father took all three of his boys to the bathroom. While father was assisting EJ on the toilet, EM pushed X to the ground and then tried to kick X. Father became angry and said, "Boy, you'll get your butt tore up for that," and directed EM to stand in the corner.

The parenting coaches who worked with the family, on the other hand, both testified that they had no concerns about the safety of the children during the visits, and that the parents were receptive to feedback. Ruks, who observed five sessions, testified that father "[a]bsolutely" seemed to want to "engage with the children, get down on their level and that kind of thing," and that he was "receptive to any feedback" that Ruks gave him, "despite [father's] claim to the contrary at beginning that he wouldn't be." Ruks testified that, during her sessions, the parents "seem[ed] to recognize that they needed [the typical supervision required for three-year-olds] and supervise them adequately."

Crank, who had only been present at two visits with the children by the time of trial, likewise testified that she saw "[n]othing that had a safety concern to [her]" and that she does "a lot of visits, and often they're like this [somewhat hectic and chaotic]. But I mean, considering there's three toddlers and two adults in one room, I wouldn't say it was overly crazy." Crank testified that, although she had only seen two visits, she did not see anything that would prevent moving to visitation in the home or community. She stated, "I think if they were supervised in the home, just to provide support, because visits—children's behavior can change when it comes into the home. As long as they're supervised in the home—I mean, so far I haven't seen anything, but it's only been two."

Crank, too, was present for the incident in which father took EM, EJ, and X into the bathroom and ultimately threatened to spank EM. Following the visit, Crank spoke with father "about the situation in the bathroom and that threatening to spank's not an appropriate way to discipline, and we discussed discipline techniques." Father responded that he "believes that spankings are a reasonable way to discipline children."

4. *Father's housing*

The parties also put on evidence regarding mother and father's current living situation. At the time of the trial, mother and father had found a home that was small but clean and well kept, and they had been living there for several months. Because of the way that the house is divided, there is a lack of visibility between rooms. Tavernier testified that her "biggest concern is the lack of visibility to those other rooms that the children would be living in," given their behavioral problems. Mother and father were subleasing part of the home to cover their rent, but the renters understood that they would be required to move out in the event that the children were returned to mother and father.

5. *Children's circumstances and needs*

a. EJ and EM

EJ had the most difficulty with the transition to foster care and was rocking, banging his head against the wall, screaming when being read to, and generally exhibiting signs of stress. Those behaviors decreased over time, but the foster mother testified that the behaviors resurfaced in February 2015 when the visits with parents increased. EJ has significant ongoing health issues that include severe asthma, which is controlled by daily use of a steroid inhaler; vision issues requiring surgery and follow-up visits; and frequent ear infections. He receives support from Willamette Education Service District (WESD) two to five times per month to address behaviors and processing deficiencies, and he receives support for speech needs.

EM likewise had difficulty with the transition to foster care and showed the same behaviors as EJ. EM's

behaviors disappeared about five months into foster care. He, like his twin, has significant ongoing health issues, including severe asthma that is controlled by a daily steroid inhaler; vision issues requiring surgery and follow-up visits; and frequent ear infections. He, too, receives support from WESD two to five times per month to address behaviors and processing deficiencies, and he likewise receives support for speech needs.

With regard to EM's and EJ's need for supervision, their foster mother described them needing a "hands on" approach for very difficult behaviors, and the director at the children's daycare testified that they require one-on-one attention almost all day. However, Ruks, who had observed five sessions, testified that "the three-year-olds, they do need constant supervision. But I did not see them as out of control; they seemed very typical for what I experience with three year-olds."

### b. X

X was originally diagnosed with failure to thrive, but he began to thrive after being hospitalized. He has a positive attachment with his foster mother, who has cared for him nearly his entire life. X does not have any developmental delays, and he has not demonstrated the same degree of behavioral problems as EM and EJ. He, like his brothers, suffers from asthma and ear infections.

### c. Father's awareness of children's needs

Father was asked at trial whether he was "aware of any special needs" that any of his three children have. Father answered, "No," but his counsel later attempted to clarify whether father would accept WESD's evaluation of what issues the kids need help with. He responded, "Yes. I'd definitely help with that."

### 6. *Trial court ruling*

The trial court, in a detailed opinion, found that the state proved the following bases for termination: that father has failed to present a viable plan for the return of the children to father's care; that father has failed to learn or assume parenting and housekeeping skills sufficient to

provide a safe and stable home for raising the children; that father has an emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time; that father has physically or emotionally neglected the children; and that father has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.[6]

The trial court explained that father was not able to address his own needs, let alone those of his children, and that his children had developed primary attachments to their foster parents. The court further explained that EM, EJ, and X have "significant medical and educational needs that the parents have only recently acknowledged and are not yet prepared to address," and that both parents "readily blame DHS for the situation their family is in, but take no personal responsibility for the children coming into care or waiting in foster care for over two years for the parents to engage in services and make the changes necessary for the children to return home." The court stated that

"father denies that he needs the services that have been recommended. He does not believe he needs domestic violence counseling and failed to engage in individual counseling until after the trial had started. Father does not recognize how his aggressive parenting negatively affects his children and how that will only be exacerbated if their attachments to their primary caregivers, the foster parents, are severed. While father did not follow through with his threat to tear up [EM's] 'butt' (while under the supervision of DHS), it is the type of behavior he testified he thought it would be appropriate to spank an older child for. Aggressive parenting is the absolute opposite type of parenting the experts testified these children need and would likely harm the children's social and emotional wellbeing."

_____

[6] The trial court found that DHS had failed to prove by clear and convincing evidence that father exposed the children to domestic violence; that father has shown a lack of effort or failure to obtain and maintain a suitable or stable living situation; and that father has shown a lack of effort to adjust his circumstances, conduct or conditions to make return of the children possible. DHS does not address those allegations, and we do not discuss them further.

## II. ANALYSIS

Father now appeals the termination judgment, arguing that the state failed to prove that he is presently unfit. According to father, DHS seeks to terminate his parental rights based on allegations that "snowballed from his hostility towards the department after his children were removed for a reason [*i.e.*, child abuse] later determined to be unfounded." DHS, in response, reprises its argument that, considering the totality of the circumstances, father is presently unfit and reintegration into father's home is not possible within a reasonable time.

### A. *Legal Standard for Termination*

To terminate a parent's rights on the basis of unfitness, a court must find that (1) the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child; (2) integration of the child into the parent's care is improbable within a reasonable time due to conduct or conditions not likely to change; and (3) termination is in the best interests of the child. ORS 419B.500; ORS 419B.504; *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). The state must establish the statutory grounds for termination by clear and convincing evidence. ORS 419B.521(1). Evidence is clear and convincing when it makes the existence of a fact "highly probable." *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 79, 106 P3d 627 (2005).

In considering whether a parent's conduct or condition is "seriously detrimental," the court focuses on the detrimental effect of the parent's conduct or condition *on the child*, "not just the seriousness of the parent's conduct or condition in the abstract." *Stillman*, 333 Or at 146. That said, a condition or conduct can be "seriously detrimental" based on the potential for such harm. *Dept. of Human Services v. R. K.*, 271 Or App 83, 88, 251 P3d 68, *rev den*, 357 Or 640 (2015). In each case, the "serious detriment" inquiry is "child-specific" and calls for testimony regarding the needs of the particular child. *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 657, 126 P3d 710 (2006).

Moreover, unfitness "must exist at the time of the termination hearing; past unfitness is insufficient." *R. K.*, 271 Or App at 89. In determining whether DHS has proved unfitness, we examine the parent's conduct and conditions in combination rather than in isolation. *See State ex rel Dept. of Human Services v. B. S. I.*, 219 Or App 158, 175, 182 P3d 230, *rev den*, 344 Or 670 (2008).

B.   *DHS Allegations Against Father*

1.   *Father's emotional illness, mental illness, or mental deficiency*

Much of DHS's case for termination is based on the specter of physical and psychological abuse by father—both against his children and against mother. As father points out, DHS initially believed that father had abused EJ and EM, which turned out to be unfounded, and it then believed that he had abused mother's older children based on their reports. DHS, however, has never proceeded on an allegation that father physically abused children, and it failed to present more than speculation that father had ever engaged in domestic violence, let alone exposed the children to domestic violence.[7]

Instead, DHS proceeded more generally on an allegation that father has an "emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time." As that allegation suggests, to terminate his parental rights, DHS must prove more than the fact that father has difficulty managing anger and anxiety, struggles with an antisocial personality disorder, or will resort to the use of physical violence against other adults. DHS must also prove the requisite nexus to father's parenting—*i.e.*, that any of his mental or emotional problems have rendered him "incapable" of providing care for his children for extended periods of time or been seriously detrimental to the children.

To prove that nexus, DHS must do more than rely on the fact that father has engaged in certain conduct or has certain conditions; DHS must present child-specific

---

[7] As noted, the trial court concluded that DHS had not proved the allegation that father had exposed the children to domestic violence. 282 Or App at 501 n 6.

evidence to demonstrate that father's emotional illness, mental illness, or mental deficiencies are seriously detrimental to EJ, EM, and X. *Huston*, 203 Or App at 657; *see also Dept. of Human Services v. A. M. C.*, 245 Or App 81, 89, 260 P3d 821 (2011) ("Unspecified detriment that we can only discern because the evidence of conduct or condition 'speaks for itself,' is a far cry from actual, clear, and convincing evidence that proves serious detriment."); *see also State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 100, 149 P3d 1124 (2006) (a personality disorder is a "condition" of the kind that may justify termination under ORS 419B.504, if there is clear and convincing evidence that that condition is seriously detrimental to child).

In this case, DHS has failed to prove the required nexus. First, DHS has not presented clear and convincing evidence that father's mental health or emotional problems, or his tendency to resort to violence, have ever manifested in domestic violence or in the type of harm or risk of harm to the children that justifies termination of parental rights. The only incidents of violence in father's past, on this record, appear to have involved adult males—*e.g.*, bar fights, street fights, and the incident involving a person who approached him near the park—and there is scant evidence of the actual frequency that such incidents had occurred over the past decade, or that father was actually modeling violent behavior in front of his children. Nor did DHS offer evidence of how father's past violence against nonfamily adults, such as the incident near the park, had affected the children.

Second, DHS failed to prove that father's mental or emotional health has resulted or will result in physical discipline that is seriously detrimental to his children. Although DHS, and some of its witnesses at trial, characterized father's discipline as "abuse," DHS has not proceeded on that theory, and we are not persuaded that there is clear and convincing evidence that father's discipline ever crossed over the line to physical abuse.[8] Nonetheless, the question

---

[8] Although the word "abuse" was sometimes used by DHS workers to characterize father's resort to physical discipline, we would be required to speculate on this record that father's use of spanking the children was of a degree or nature sufficient to constitute physical abuse. *Cf. G. A. C. v. State ex rel Juv. Dept.*, 219 Or App 1, 13, 182 P3d 223 (2008) ("In short, mother's conduct was not

remains whether father's "aggressive parenting"—as a product of his personality disorder or mental and emotional health—might nevertheless be seriously detrimental to the children, given their particular needs.

Although the trial court found that "[a]ggressive parenting is the absolute opposite type of parenting the experts testified these children need and would likely harm the children's social and emotional wellbeing," the record simply lacks clear and convincing evidence that any such harm would be the type of *seriously detrimental* effect required for termination. The mental health experts who testified about the needs of EM, EJ, and X did not testify about the seriously detrimental effect that physical discipline would have on those children, and the record does not include evidence from which we could infer that spankings—even if not a preferred method of parenting these children—affects them so differently than the "many thousands of children [who] are being raised under basically the same circumstances" in Oregon. *State v. McMaster*, 259 Or 291, 304, 486 P2d 576 (1971);[9] *State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 717, 145 P3d 366 (2006) ("Parents' failure to do so may fall short of what would be expected of model parents, but that is not the standard."). In short, the record lacks highly persuasive and child-specific evidence that father's

'discipline'—rather, it was physical abuse that caused substantial welts, bruising, and pain. That conduct endangered V's welfare and, accordingly, V is within the jurisdiction of the juvenile court.").

[9] As the court recognized in *Stillman*, 333 Or at 151-52, the legislature amended ORS 419B.504 after *McMaster* to include conduct similar to the McMasters' as a basis for termination. However, we and the Supreme Court have continued to rely on the *McMaster* formulation of whether the relevant conduct or condition is "seriously detrimental." *See Smith*, 338 Or at 87-88 (quoting *McMaster*, 259 Or at 302-03, for the proposition that, "under previous version of statute, when legislature used phrase 'seriously detrimental to the child' it had 'in mind a more serious and uncommon detriment' than that caused by the parents' inability 'to furnish surroundings that would enable child to grow up as we would desire all children to do'"); *Stillman*, 333 Or at 152 ("[A]s in *McMaster*, we do not think that the level of anxiety that the children have experienced here is the sort of serious detriment that the legislature contemplated as providing the basis for a conclusion that a parent is unfit."); *State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 790-91, 126 P3d 758 (2006) ("The Supreme Court has explained that 'seriously detrimental' means more than the inability 'to furnish surroundings which would enable the child to grow up as we would desire all children to do.' [*McMaster*, 259 Or at 303]. Instead, '[t]he legislature had in mind conduct substantially departing from the norm * * *.' *Id.* at 304.").

use of physical discipline would be seriously detrimental to EM, EJ, and X.

For the foregoing reasons, we conclude that DHS failed to prove its allegation that father's emotional illness, mental illness, or mental deficiency provides a basis on which to terminate father's parental rights.

2. *Father's failure to learn or assume parenting skills*

DHS also alleged, and the trial court found, that father failed to learn or assume parenting and housekeeping skills sufficient to provide a safe and stable home for raising the children. As we understand DHS's case, that allegation relates predominantly to father's resort to physical discipline. DHS points to the incident in the bathroom, which, according to DHS, "illustrates father's lack of parenting skills in three ways." First, father was "unable to maintain control of the boys despite being alone with them for only 10 minutes of a 90 minute visit." Second, despite coaching as to why spanking was inappropriate, he continued to threaten it. And third, father "failed to learn that psychological damage can result from such threats and that it is not good parenting to model one behavior—physical threats and spanking—when expecting the children not to act out physically with each other."

As explained above, we are not persuaded, on *de novo* review, that father's use of physical discipline—even if not preferred parenting—presents a condition that is seriously detrimental to EM, EJ, and X. Nor is the incident, by itself or in combination with other evidence, a sufficient basis for termination. The testimony regarding father's ability to parent his children safely during visits was mixed; although there was testimony from DHS that father allowed children to walk on unstable chairs and was unable to manage their behaviors, the parenting coaches testified that they were not concerned about safety. In any event, the record lacks clear and convincing evidence that father's lack of parenting or housekeeping skills, as demonstrated during the visits, posed the type of harm to the children that would justify terminating his parental rights. That is, even assuming that father's lack of parenting or housekeeping skills might be harmful to his children, DHS has not proved the "more

serious and uncommon" detriment that is required to terminate parental rights. *McMaster*, 259 Or at 303; *Smith*, 338 Or at 87 (noting that, although the "evidence of mother's conduct during visitations did not flatter her," the child was never injured or in any danger during her visits; and explaining that, although "perfection in parenting" was not attainable for mother, "neither is it required").

### 3. *Father's physical and emotional neglect*

The trial court also found that father was unfit on the basis of physical and emotional neglect. Again, we are not persuaded that father's conduct—although less than preferable—rises to the level required for termination of his parental rights, particularly when viewed as of the time of the termination trial. Father had been visiting his children and making efforts to work with parenting coaches from March 2015 through the termination trial. And, as DHS acknowledges, there is a question in the record as to how much father and mother were actually notified of the children's medical appointments; in light of that uncertainty, and given father's other efforts with regard to visiting his children, we are not persuaded that any past emotional and physical neglect rendered father unfit at the time of the hearing. *See Smith*, 338 Or at 83 ("[T]o support termination under ORS 419B.504, the condition had to render the parent unfit *at the time of the termination hearing*." (Emphasis in original.)).

### 4. *Father's lack of a viable plan*

DHS next argues that father failed to present a viable plan for the return of the children to his care. According to DHS, father has no plan to meet—and has barely acknowledged—the special needs of his children, and he still lacks housing that is "appropriate for parenting the children." Father, on the other hand, argues that he "had a home that even department workers deemed safe," that father could continue his counseling "under the watchful eye of the department while the boys are in his care," and that father's understanding of his children's needs must be considered in light of how little parents were included in any medical appointments.

First, we are not persuaded by DHS's argument regarding father's current housing. The evidence in the record suggests that father's current housing would be minimally adequate to parent his children, and the concerns about "visibility" in the home do not persuade us that it cannot be made safe for young children.

Second, we are not persuaded that father's lack of a plan to meet the children's medical and educational needs is a sufficient basis on which to terminate his parental rights. Although father demonstrated a limited understanding of his children's medical needs, DHS did not prove that those needs, while significant, are beyond father's ability to monitor with assistance from DHS and medical providers.

Likewise, father was slow to recognize his children's educational and developmental needs, but he articulated a willingness to rely on agencies like WESD to assess the children's needs and to work with those agencies, and DHS did not present clear and convincing evidence to persuade us otherwise.[10]

For those reasons, and in light of the other circumstances of this case, including DHS's failure to prove that father's mental and emotional health and parenting skills are seriously detrimental to the children, we are not persuaded that father is unfit based on his failure to present a viable plan for the return of the children.

### 5. *Father's failure to effect a lasting adjustment*

Finally, we are not persuaded that father's failure to make a "lasting adjustment" is itself a basis on which to terminate father's parental rights. Father failed to engage in all of the services that were required by DHS, and that failure has delayed possible reunification. However, given the particular circumstances of this case, including DHS's failure to prove that father's mental and emotional health, parenting skills, and housing situation—the underlying conditions that father was asked to adjust—were seriously detrimental to the children at the time of trial, we are not

---

[10] Although father was unwilling to work with DHS, the record does not reflect similar hostility toward educational assistance for his children.

persuaded that the delay occasioned by the lack of adjustment in those areas has been seriously detrimental to the children or that father's lack of cooperation with DHS should effectively serve as an independent basis on which to terminate his rights at the present time. *Cf. State ex rel Dept. of Human Services v. Rodgers*, 204 Or App 198, 221, 129 P3d 243 (2006) ("[F]ather's hostility toward DHS was part of a general refusal to participate in services that would have been an essential part of establishing that it was safe to return child to father's care.").

## III. CONCLUSION

In sum, we agree with father that DHS has not proved by clear and convincing evidence that he is presently unfit for the reasons alleged in the termination petition. Accordingly, we reverse and remand the termination judgments.[11]

Reversed and remanded.

---

[11] We note, as father points out in his brief, that "[d]enying termination does not mean that jurisdiction is dismissed and supervision is non-existent." That is, DHS's failure to prove a basis for termination by clear and convincing evidence does not mean that there is no basis for jurisdiction or that the children must be immediately returned to parents' care without DHS involvement.