Submitted April 16, 2019, affirmed June 16, 2021

In the Matter of M. P.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

M. P.,
*Appellant.*

Wasco County Circuit Court
18CC03574; A168440

493 P3d 1051

In this appeal from a mental health commitment order, appellant challenges the trial court's decision to allow two state witnesses to testify by telephone. Appellant argues that the court committed legal error under ORS 45.400 by allowing a psychiatrist to testify by telephone about appellant's diagnosis and symptoms, and by allowing a witness to testify about appellant's erratic and dangerous driving. Appellant contends that the court did not make the requisite finding of good cause, nor properly account for prejudice, each as required under ORS 45.400, and claims the Court of Appeals should review for legal error. *Held*: Following a 2017 amendment to ORS 45.400, the decision to allow telephonic testimony is committed to the discretion of the trial court, and consequently, is reviewed for abuse of discretion, not legal error. In this case, because the challenged evidence was cumulative of other evidence, even if the trial court abused its discretion by allowing the telephonic testimony, the error was harmless.

Affirmed.

Karen Ostrye, Judge.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and Aoyagi, Judge, and Hadlock, Judge pro tempore.

HADLOCK, J. pro tempore.

Affirmed.

**HADLOCK, J. pro tempore.**

Appealing an order committing her to the custody of the Mental Health Division, appellant challenges the trial court's decision to allow two witnesses for the state to testify by telephone over her objection. As explained below, we conclude that any error committed by the trial court was harmless given the evidentiary record in this case. We therefore affirm.

A complete description of the extensive evidentiary record would not benefit the parties, the bench, or the bar. Accordingly, we begin by summarizing—rather than detailing—the most important evidence (not including the telephonic testimony to which appellant objected).

Appellant has been diagnosed with bipolar disorder with psychotic features and, by the summer of 2018, she had been a client of the Mid-Columbia Center for Living (MCCFL) in The Dalles for "quite a long time." That June, appellant was not taking all of her prescribed medications, and she had been "slowly and then catastrophically, rapidly declining and failing" at her work with an MCCFL treatment team. Appellant's decompensation involved symptoms of delusions and mania; she sometimes referred to herself as Lucifer and when doing so, spoke in a gravelly voice.

Appellant's symptoms manifested in behavior that resulted in multiple calls to police officers over several days. Twice in mid-June, appellant was "trespassed" from businesses because of her conduct and yelling. Also in mid-June, appellant was found lying in an intersection at 2:45 in the morning; when a person asked if everything was okay, appellant held a long-bladed knife to her temple, then repeatedly stabbed it into the road, hard enough to damage the roadway, and then into a telephone pole. Police were called and observed appellant talking "about the devil and she's out protecting something."

Later that day, appellant met with MCCFL staff, but she was "so manic that she just could not really engage in even a reality-based conversation." Afterward, appellant stood in the road, responding to internal stimuli and not

paying attention to things going on around her. An MCCFL clinical supervisor, Springer, saw that cars coming around a corner "had to stop and redirect to avoid hitting [appellant], and she did not seem to be aware that they were there." MCCFL staff tried to redirect appellant and encouraged her not to drive, but "she was very adamant that * * * she could drive just fine." Appellant got into her car, made "a blind U-turn without checking for cross-traffic," then drove along a street "[w]hile rifling through her passenger seat with both hands." Also that afternoon, police responded to a report of appellant driving recklessly on the highway, nearly crashing into other vehicles, sometimes driving as slowly as 30 miles per hour, and throwing objects out the window of her car.[1]

After that incident, appellant was transported to the Unity Center for Behavioral Health in Portland, where she engaged in voluntary treatment for a few days, doing better with medication. Appellant subsequently stopped taking medication, but Unity staff did not believe she was dangerous, so she was discharged in late June.

Within hours, appellant was again observed driving erratically in The Dalles, swerving in and out of her lane (once toward an oncoming truck), swerving toward two children and then braking hard and yelling at them, speeding up and slowing down, slamming on her brakes, not stopping at a stop sign near a school, and sometimes leaning out the passenger side window while driving, so that her hands were not on the steering wheel of her car.

The next day, appellant, who was carrying a long metal weather vane, entered the yards of two residences to which she had not been invited. At one house, appellant growled and said things that made it sound "like she was possessed." Appellant became upset when the home's resident would not give her his hand so she could bless him, scaring the resident enough that he contemplated using a baseball bat against her.

---

[1] A police officer testified without objection about that reported conduct. As we discuss later in this opinion, a person who directly witnessed and reported appellant's driving (Devine) was permitted to testify by telephone over appellant's objection.

Appellant then went to the second house, where a child-care facility was operated. The resident—who was caring for several children that day—told appellant to leave. Appellant said that she was there "to bless the children" and said she wanted to see them. When the resident refused that request, appellant started swinging the weather vane at the resident, coming within a foot or two of her. Another adult in the house persuaded appellant to leave the yard, but she continued to insist that she could be there and, at some point, said that she would be back to get the children.

A responding police officer heard appellant say that she was Lucifer "and that [appellant's name] had died and Lucifer had taken over." Appellant also said "something about Satan wanting her to get the kids, get the children." The resident told the officer that, if appellant returned and entered the house brandishing the weather vane, the resident would use deadly force against her. The resident, her daughter, and her daughter's fiancé all carried guns with them for the rest of the day. An officer told appellant that people in the neighborhood were so scared that one might shoot her if she did not stay away from their property. Appellant did not seem to take that seriously.

A few hours later, police arrested appellant after two incidents, about a half-hour apart, that involved appellant being disruptive at restaurants and running in the middle of a street. Appellant bit a police officer's leg; he testified that she would have taken "a chunk" out of his leg had he not been wearing a knee brace. After police took appellant to a hospital, she yelled at and tried to make physical contact with other people there, including a small child. At one point, despite having been put in restraints, she hit a sheriff's deputy in the torso.

Later that evening, appellant was transported back to Unity in Portland. Two or three days later, MCCFL supervisor Springer visited appellant at Unity to conduct a commitment investigation. Appellant was refusing all prescribed medications and became so agitated when questioned that she had to be escorted back to her room. At that point, appellant was exhibiting a "severely impaired thought process[]," "delusional content," and "impaired insight and

judgment" as symptoms of her bipolar disorder. Springer testified that appellant believed that she did not have a mental illness and did not need medications.

The commitment hearing took place in Wasco County and appellant was transported there from Unity's facility in Portland. At the beginning of the hearing, before other witnesses testified to the facts described above, the state proposed to call a Unity psychiatrist, Veeder, to testify by telephone. Appellant objected to telephonic testimony, and the state responded that it would be a hardship for Veeder to travel from Portland for the hearing, "as he is seeing other patients." Appellant asserted that she would be prejudiced by the inability to cross-examine Veeder in person; she also argued that travel from Portland was "doable." The trial court overruled the objection and allowed Veeder to testify by telephone, finding good cause not to make "a doctor who has patients to see" travel the distance involved, and determining that appellant would "be able to sufficiently cross-examine" him by telephone.

Veeder then testified, over the telephone, about his credentials, about Unity being a psychiatric hospital, and about appellant's recent stays there. He discussed appellant's diagnosis of bipolar disorder, her symptoms (including her unstable mood, thought disorganization, and "misperceptions of reality"), when appellant did and did not take particular psychiatric medications (she once was medicated involuntarily because of the way she was yelling at staff), how she responded to medications, and his recommendations for future treatment. Veeder testified that, once or twice a day, appellant and staff had "somewhat tense" interactions that involved yelling, with staff unable to redirect appellant. However, he acknowledged that appellant had not been physically violent during her hospitalization at Unity. In addition, Veeder testified about what appellant and others had told him about some of the incidents outside the hospital. Veeder believed that appellant's interactions with other people were likely to result in "really bad harm" and that she was both dangerous to herself and dangerous to others. He believed the risk was imminent, particularly because appellant was rehospitalized so soon after her initial discharge from Unity.

On cross-examination, appellant briefly questioned Veeder about his interactions with appellant during her most recent hospitalization and the medications she had been prescribed.

The commitment hearing had started in the morning and the court took a lunch break after part of Veeder's testimony. After that break, the state indicated that it wanted to call witness Devine to testify by telephone because, after waiting at court to testify during the morning, Devine had left to take a friend to the airport. Appellant again objected to telephonic testimony, asserting that no good cause had been shown for such testimony and that Devine would be testifying about crucial events. The trial court overruled the objection.

Devine then testified by telephone about having seen appellant driving erratically on the interstate highway and in The Dalles. He described appellant's conduct as swerving between lanes, accelerating excessively and then stomping on the brakes, driving both very slow and very fast, yelling, and throwing objects out of her car. Devine testified that defendant had nearly missed striking two vehicles that she had swerved toward, causing one of them to "make an erratic movement" to avoid her. Appellant did not cross-examine Devine.

After Devine testified, the state called several other witnesses, whose in-person testimony provided the basis for the description of facts earlier in this opinion. The last witness to testify was Springer, who had been present throughout the hearing. The state's attorney asked him "what symptoms of [appellant's diagnosed condition], in your opinion, is she exhibiting?" He responded, "I see severely impaired insight and judgment, severely impaired thought processes, and inability to kind of start a thought at A and—and end up at B." He also testified that appellant "seems to have a lot of delusional content * * * as evidenced by things like 'I'm Lucifer,'" and she becomes angry, agitated, and resistant if those beliefs are challenged. Springer believed that appellant's recent actions, including her assaultive behavior, were directly related to her mental illness, although he testified on cross-examination that he could not say that her "bad

driving" was due to her mental illness. However, every time that Springer asked appellant what her plan is if she was released, her answer has "consisted of, 'Take me to my car. Take me to my car.'"

In closing argument, the state argued that appellant should be committed because her mental disorder made her a danger to herself and others. In response, appellant asserted that the state's theory for commitment was appellant's use of a car, and she argued that there was no evidence that her erratic driving was due to her mental disorder or that she was "using her car as a weapon." Appellant conceded that she had engaged in "a lot of erratic behavior," but argued that "it's not dangerous behavior." The trial court agreed with the state, finding that appellant had a mental disorder that "absolutely" made her dangerous to herself and to others. Accordingly, the court entered an order of commitment.

On appeal, appellant does not challenge the trial court's ultimate determination that her mental disorder made her dangerous to herself and to others. Rather, her single assignment of error—challenging the trial court's rulings that permitted witnesses and Veeder to testify by telephone—implicates ORS 45.400(3) and (4), which provide in part:

"(3)(a)  Except as provided under subsection (5) of this section [relating to jury trials], the court may allow remote location testimony under this section upon a showing of good cause by the moving party, unless the court determines that the use of remote location testimony would result in prejudice to the nonmoving party and that prejudice outweighs the good cause for allowing the remote location testimony.

"(b)  Factors that a court may consider that would support a finding of good cause for the purpose of a motion under this subsection include [listing factors]:

"(c)  Factors that a court may consider that would support a finding of prejudice under this subsection include [listing factors]:

"(4)  In exercising its discretion to allow remote location testimony under this section, a court may authorize

telephone or other nonvisual transmission only upon find-
ing that video transmission is not readily available."[2]

Relying largely on *Dept. of Human Services v. K. A. H.*,
278 Or App 284, 289-92, 381 P3d 1052, *rev dismissed*, 360
Or 637 (2016), appellant contends that we review the trial
court's rulings allowing telephonic testimony "for legal
error." Applying that standard, appellant argues that the
rulings were erroneous because the trial court's "good cause"
determinations were not supported by sufficient evidence or
reasoning. Appellant also argues that the trial court should
have determined that prejudice to appellant outweighed any
good cause because "the testimony was central to the issue
of dangerousness and driving related to symptoms of a men-
tal disorder, and appellant's liberty was at stake." Finally,
appellant observes that the trial court did not assess whether
video transmission, rather than telephonic testimony, would
have been readily available, as ORS 45.400(4) requires.

In response, the state first argues that ORS 45.400
does not apply to commitment proceedings because such
actions are not "civil proceedings." In support of that con-
tention, the state points to ORS 426.095, which sets out the
procedures governing commitments; it asserts that those
procedures "are fundamentally inconsistent with ORS
45.400." The state also argues that, even if ORS 45.400(3)
does apply in commitment proceedings, the trial court did
not err by allowing the telephonic testimony under the cir-
cumstances, noting the short timelines and other practical
considerations that apply in commitment proceedings. With
respect to ORS 45.400(4), the state concedes that the trial
court did not consider the availability of video testimony,
as that provision requires. However, the state concludes by
arguing that appellant was not prejudiced by any statutory
violation because she was able to cross-examine the wit-
nesses if she wished, and their testimony was cumulative of
other evidence introduced at the hearing.

As a preliminary matter, we note that our ultimate
determination is that reversal in this case is not warranted

---

[2] "Remote location testimony" is defined to mean "live testimony given by a
witness or party from a physical location outside of the courtroom of record via
simultaneous electronic transmission," and "simultaneous electronic transmis-
sion" is defined to include transmission by telephone. ORS 45.400(8)(a), (b).

because any violation of ORS 45.400(3) or (4) was harmless. Accordingly, we need not—and do not—address the state's contention that the provisions of ORS 45.400 do not apply in commitment proceedings. The analysis that follows therefore assumes, without deciding, that ORS 45.400(3) and (4) govern the trial court's decision whether to allow telephonic testimony at a commitment hearing.

Our analysis begins with consideration of our standard of review. As noted, relying on *K. A. H.*, appellant contends that we review the trial court's ultimate determination as to the permissibility of telephonic testimony under ORS 45.400(3) for legal error. Indeed, broadly speaking, that is what *K. A. H.* held. *See* 278 Or App at 292 ("we review[ed] for legal error" the trial court's determination under the particular subsections of ORS 45.400(3) (2015), *amended by* Or Laws 2017, ch 240, § 1, at issue in that case).

But that holding from *K. A. H.* does not apply here, because it was based on a version of ORS 45.400 that has since been amended in material ways. The version of ORS 45.400 applied in *K. A. H.* used mandatory language, stating that a trial court "may not allow the use of telephone testimony" if certain circumstances exist, and the analysis in *K. A. H.* relies in part on the existence of that mandatory phrasing. *See K. A. H.*, 278 Or App at 290-92 (quoting and discussing ORS 45.400(3) (2015)). The legislature deleted that provision after *K. A. H.* issued. Or Laws 2017, ch 240, § 1. Instead of using such mandatory language in the amended statute, the legislature added permissive wording that says a trial court "may consider" listed factors that would support either "a finding of good cause" or "a finding of prejudice." ORS 45.400(3)(b)-(c). Moreover, the legislature added a provision that expressly makes the decision whether to allow telephonic testimony in nonjury proceedings a matter of trial court discretion except in specified circumstances:

> "In *exercising its discretion* to allow remote location testimony under this section, a court may authorize telephone or other nonvisual transmission only upon finding that video transmission is not readily available."

ORS 45.400(4) (emphasis added).

Thus, the 2017 amendments to ORS 45.400 (which took effect before the commitment hearing in this case) made the trial court's decision whether to allow telephonic testimony in nonjury proceedings a matter of trial court discretion. Accordingly, when such a decision is challenged on appeal, we review for abuse of discretion.

We discuss the applicable standard of review, despite our ultimate conclusion that reversal is not warranted because any error was harmless, because the briefing in this case suggests that there may be some uncertainty regarding the two distinct points in time at which consideration of "prejudice" comes into play when ORS 45.400(3) is raised at trial and then on appeal.

First, even when the proponent of telephonic testimony has shown "good cause" for allowing such testimony, the trial court must consider whether an objecting party will be prejudiced if the witness is permitted to testify by phone, instead of in person. *See* ORS 45.400(3)(a), (c) ("the court may allow remote location testimony * * * upon a showing of good cause by the moving party, unless the court determines that the use of [such] testimony would result in prejudice to the nonmoving party and that prejudice outweighs the good cause for allowing the remote location testimony"; subsection (c) lists "[f]actors that a court may consider that would support a finding of prejudice"). Thus, under the current version of ORS 45.400(3)(a), the court balances any prejudice against the "good cause" for allowing the telephonic testimony, with the ultimate determination reviewed for abuse of discretion.[3]

Second, as a matter of appellate jurisprudence, we must consider whether the appellant was prejudiced by any error that the trial court committed by admitting telephonic testimony over the appellant's objection. Put more precisely, we must consider whether any error was harmless. *See generally State v. Hughes*, 192 Or App 8, 18-19, 83 P3d 951 (2004), *rev dismissed*, 338 Or 17 (2005) (applying

---

[3] Under the former version of the statute, applied in *K. A. H.*, a determination of "substantial prejudice" to an objecting party absolutely barred the admission of telephonic testimony. ORS 45.400(3)(f) (2015) (quoted in *K. A. H.*, 278 Or App at 290).

harmless error analysis to a claim of evidentiary error in a commitment hearing). In determining whether purportedly erroneous admission of evidence was harmless, we consider whether there is "some likelihood that the challenged evidence affected the verdict." *State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019). In performing that analysis, "we consider the nature of the evidence in the context of the trial as a whole," taking into account "all portions of the record" and "whether the [challenged] evidence was cumulative of other evidence admitted without objection." *Id*.

    In this case, appellant argues on appeal that the trial court erred in allowing Veeder and Devine to testify by telephone. She begins by asserting that giving in-person testimony would not have caused those witnesses any hardship, and accordingly there was not good cause for allowing telephonic testimony. Appellant then asserts that "the prejudice to appellant outweighed any good cause." On the latter point, she further explains, with respect to Veeder's testimony:

> "(1) face-to-face cross-examination was necessary because the issues that the witness testified about may be determinative to the outcome, and (2) appellant's liberty was at stake. Indeed, appellant was involuntarily committed for 180 days based on the court's reliance on Veeder's testimony about appellant's diagnosis, appellant's statements to Veeder, and Veeder's description of appellant's behavior in the hospital."

With respect to Devine's testimony, appellant argues "that the prejudice to appellant outweighs any arguable good cause since the testimony was central to the issue of dangerousness and driving related to symptoms of a mental disorder, and appellant's liberty was at stake."

    In our view, appellant's prejudice argument appears focused on the *trial court's* discretionary determination, under ORS 45.400(3), of whether prejudice to appellant outweighed any good cause. The argument echoes factors that ORS 45.400(3) says a trial court may consider in assessing prejudice from telephonic testimony, including whether "the issue * * * may be determinative of the outcome" and

"due consideration for a person's liberty \*\*\* interests." ORS 45.400(3)(c)(B), (D). Appellant has not separately argued— at least, not expressly—that any error in admitting the telephonic testimony was not harmless, when that challenged evidence is considered in the context of the other evidence admitted at hearing. Arguably, appellant's failure to articulate a "not harmless error" argument is enough, by itself, to defeat her claim that admission of the telephonic testimony requires reversal. *See Simon*, 294 Or App at 849 (appellant claiming evidentiary error "has the burden to show some likelihood that the challenged evidence affected the verdict").

In this case, however, we nonetheless have evaluated the record to determine whether any error associated with admitting the telephonic testimony was harmless. We have done that for two reasons. First, despite echoing the provisions of ORS 45.400(3) that are directed to the trial court's prejudice determination, appellant's argument also alludes to what she perceives to be a basis for the court's ultimate decision—which could be understood to at least hint at a contention that any error was not harmless. Second, the decision in *K. A. H.* is somewhat ambiguous about whether we undertook a harmless-error analysis on appeal in that case, and the opinion could understandably (albeit incorrectly) be read to suggest that such an analysis was not necessary. *See* 278 Or App at 295-96 (noting both that the respondent had not made a harmless-error analysis and that the appellant had proved prejudice). Given the confluence of those circumstances, we decline to affirm solely on the absence of a "not harmless error" argument in appellant's brief.

We therefore have reviewed the entire record to determine whether any error associated with admitting the telephonic testimony was harmless or, instead, requires reversal. Having performed the necessary analysis, we find it sufficient to state that any error associated with admitting Devine's telephonic testimony about appellant's erratic driving is harmless when viewed in light of the other evidence about her driving, including testimony about another incident that occurred closer in time to the hearing and that involved dangerous behavior, including swerving toward children. Similarly, any error associated with admitting

Veeder's telephonic testimony, which focused on appellant's diagnosis, treatment and prehearing behavior at Unity, is harmless when considered in light of other evidence on the same and related topics, particularly Springer's testimony about appellant's mental health, specific incidents of risky behavior linked to her mental disorder, and how appellant's conduct and statements continued to reflect her mental disorder through the day of the hearing. Put succinctly, those two witnesses' telephonic testimony was cumulative in material respects to other testimony admitted at trial. Because any error associated with admitting the telephonic testimony was harmless, we need not determine whether the trial court erred when it admitted that testimony.

Affirmed.