Argued and submitted November 30, 2022, affirmed May 24, 2023

In the Matter of J. E. D. V.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner below,*
*and*
S. L. D.,
*Respondent,*
*v.*
J. E. D. V.,
*Appellant.*
Clackamas County Circuit Court
20JU01194; A178519 (Control)

In the Matter of E. L. D. V.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner below,*
*and*
S. L. D.,
*Respondent,*
*v.*
E. L. D. V.,
*Appellant.*
Clackamas County Circuit Court
20JU01221; A178520

In the Matter of M. J. D. V.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner below,*
*and*
S. L. D.,
*Respondent,*
*v.*

M. J. D. V.,
*Appellant.*

Clackamas County Circuit Court
20JU01191; A178620

In the Matter of J. E. D. V.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Appellant,*

*v.*

S. L. D.,
*Respondent.*

Clackamas County Circuit Court
20JU01194; A178619

In the Matter of E. L. D. V.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Appellant,*

*v.*

S. L. D.,
*Respondent.*

Clackamas County Circuit Court
20JU01221; A178621

In the Matter of M. J. D. V.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Appellant,*

*v.*

S. L. D.,
*Respondent.*

Clackamas County Circuit Court
20JU01191; A178622

531 P3d 683

The Department of Human Services (DHS) and mother's three children involved in this proceeding appeal judgments dismissing with prejudice DHS's petitions to terminate mother's parental rights to the children. The juvenile court

ruled that DHS failed to prove mother was unfit and dismissed the petitions at the close of DHS's evidence. On appeal, DHS and the children assign error to the dismissal of the petitions, the denial of DHS's motion to allow remote testimony of Dr. Miller, and the denial of the children's motions for mistrial. *Held*: On *de novo* review, ORS 19.415(3)(a), the Court of Appeals found that DHS failed to prove by clear and convincing evidence that mother is unfit, as would be required to terminate her parental rights. The court also concluded that the juvenile court did not abuse its discretion in dismissing the petitions with prejudice at the close of DHS's evidence, in denying DHS's motion for remote testimony, or in denying the children's motions for mistrial.

Affirmed.


Ulanda L. Watkins, Judge.

Christa Obold Eshleman argued the cause for appellants children. Also on the briefs was Youth, Rights & Justice.

Inge D. Wells, Assistant Attorney General, argued the cause for appellant Department of Human Services. Also on the reply brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General. On the opening brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Stacy M. Chaffin, Assistant Attorney General.

Sarah Peterson, Deputy Public Defender, argued the cause for respondent. Also on the brief was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Before Ortega, Presiding Judge, and Mooney, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

The Department of Human Services (DHS) and mother's three children involved in these proceedings (M, J, and E) appeal judgments dismissing with prejudice petitions to terminate mother's parental rights to the children. The juvenile court ruled that DHS failed to prove mother was unfit and dismissed the petitions at the close of DHS's evidence. On appeal, DHS and the children assign error to the denial of the children's motions for mistrial, the dismissal of the petitions with prejudice, and the denial of DHS's motion to allow remote testimony of Dr. Miller.

On *de novo* review, ORS 19.415(3)(a), we find that DHS failed to prove by clear and convincing evidence that mother is unfit, as would be required to terminate her parental rights. We also conclude that the juvenile court did not abuse its discretion in denying the children's motions for mistrial, in dismissing the petitions with prejudice at the close of DHS's evidence, or in denying DHS's motion for remote testimony. Accordingly, we affirm.

A complete description of the extensive evidentiary record would not benefit the parties, the bench, or the bar. Accordingly, aside from the procedural history, we recount only those facts necessary to explain our rulings and do so in our analysis of each assignment of error.

## I.   PROCEDURAL HISTORY

As of March 2018, mother had four children: M (born in 2010), J (born in 2013), and E (born in 2016), all from a prior relationship, and their infant half-sibling L (born in 2017). DHS had, over a period of four years, received several reports of concern regarding the family (at first, mother, M, J, E, and their father, and later, mother, the children, L, and L's father), including, most recently, that they had been evicted and were living in various hotels. DHS took the children into protective custody after hotel staff twice reported to authorities that the children were wandering around hotel grounds without supervision and were left unattended in the family's room.

In May 2018, the juvenile court ruled that M, J, and E were within its dependency jurisdiction based on mother's admissions that she lacked stable housing,[1] that she has a "mental disability that requires evaluation and appropriate treatment in order to effectively parent," and that the children all tested positive for methamphetamine exposure shortly after removal, despite being placed in separate, nonrelative foster homes.[2] The juvenile court placed the children with their father, who had not been involved with them since before E's birth. The following month, father returned the children to DHS custody after deciding that he was unable to parent them, and they were again placed in separate, nonrelative foster homes.

The parties agree that mother has exhibited open hostility and opposition toward DHS throughout the underlying dependency cases. From the outset, DHS imposed visit guidelines, such as not talking about the case in the children's presence, not contacting the children's foster care providers, and not using inappropriate language or making demeaning statements to the children or to DHS staff, and mother regularly violated those guidelines.

As a consequence, the juvenile court granted DHS's requests in April 2018, at the very beginning of the proceedings, to reduce mother's visits with all three children and, in October 2018, to suspend visits with J and E, to reduce visits with M to once weekly, and to confer authority to DHS to end those visits at its discretion. Mother's visits with J and E resumed in March 2019, but DHS again suspended visits with J in July 2019 at the recommendation of J's therapist. DHS also briefly paused visits with M and E in July 2019 and again in August 2021, and mother sporadically missed visits and refused to visit due to her dissatisfaction with DHS guidelines. Mother was limited to video visits for about three months (March to May 2020) due to the pandemic. E

---

[1] The juvenile court also determined it had jurisdiction over L and, later, L's newborn sibling H (born in 2019), but those dependency cases were ultimately dismissed when their father was granted sole custody of L and H after a domestic relations trial.

[2] Mother never tested positive for methamphetamine, and drug use was never a jurisdictional basis.

and M stopped attending visits in April 2021 and December 2021, respectively.

In January 2020, the juvenile court changed the permanency plan from reunification to adoption for all three children, and the following month DHS filed petitions to terminate mother's parental rights. The petitions alleged (1) lack of effort or failure to obtain or maintain a suitable or stable living situation for the children so that return to mother's care is possible; (2) failure to present a viable plan for the return of the children to mother's care and custody; (3) failure to learn or assume parenting skills sufficient to provide a safe and stable home for raising the children; (4) a mental health condition of such nature and duration as to render mother incapable of providing proper care for the children for extended periods of time; (5) physical and emotional neglect of the children; and (6) failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

Trial was scheduled for November 2020 and was continued twice to allow DHS additional time to locate adoptive placements for the children. The court continued trial twice more in July and November 2021 after the court appointed new counsel to represent mother.

The termination trial was held over four days in March 2022. DHS presented evidence that focused on its assertions that mother's mental health significantly impairs her ability to safely parent and renders her unwilling to accept feedback on how to meet her children's needs. At the close of DHS's evidence, the juvenile court found that DHS had failed to prove by clear and convincing evidence that mother is unfit, and it dismissed the termination petitions with prejudice. DHS and the children now appeal the resulting judgments.

## II.   MISTRIAL

We begin by addressing the children's first through third and DHS's ninth through eleventh assignments of error, which challenge the juvenile court's denial of the children's motions for mistrial that were filed three weeks after

trial had concluded. The juvenile court did not abuse its discretion in denying those motions.

Three days into the four-day trial, counsel for J and E asked one of the doctors who had evaluated mother, Dr. Duncan, a hypothetical question about an incident involving mother experiencing difficulty going through courthouse security. Mother's counsel objected to the question as assuming facts not in evidence, and the juvenile court sustained the objection. The children's attorney inquired about the court's reasoning, and the court explained that it was not a "fair" hypothetical because "those facts you just gave to him are not accurate." Counsel made no objection at that time and did not otherwise pursue any issue regarding the court's ruling or statement during the remainder of trial.

On April 8, 2022—21 days after trial had concluded—the children's counsel filed motions for mistrial that also asked Judge Watkins to recuse herself.[3] The motions were supported by a declaration and an affidavit. The declaration, submitted by DHS permanency supervisor and trial witness Jennifer Delvin, averred that on the first day of trial, Delvin saw mother and Judge Watkins speaking to each other in the courthouse hallway during a break in the proceedings and overheard mother complain to Judge Watkins that she wanted "that fat woman," whom Delvin assumed referred to DHS's attorney, to stop "glaring" and "smirking" at her. Delvin further averred that Judge Watkins spoke to mother, but that Delvin did not hear what she said. The affidavit, submitted by E's foster mother, averred that either that day or the following day, Judge Watkins's clerk told those in the courtroom that mother was "having difficulty going through security" and that the judge "had gone down to security to see if there was anything she could do to be of assistance" to her. E's foster mother further averred that the children's counsel posed the hypothetical question about mother's

_____

[3] E and J each filed a written motion captioned "Motion for Finding of Mistrial." M filed a written motion captioned "Child's Motion for Mistrial." All three motions recited that DHS "joins in this motion." DHS did not file its own separate motion. Each motion contained a request that Judge Watkins recuse herself, although no party filed a motion to disqualify for cause under ORS 14.210 or for perceived bias under ORS 14.250. No motion to disqualify the judge was filed in this case.

difficulty with courthouse security to Duncan when court had resumed that day.

The children's counsel argued in the motions that Judge Watkins was required to declare a mistrial and recuse herself because the averred facts and Judge Watkins's statement about the hypothetical posed to Duncan demonstrated that Judge Watkins had engaged in improper *ex parte* communication with mother and had become a trial witness, both of which violated the children's due process rights to an impartial tribunal. As noted, the motions were filed more than three weeks after the events underlying the allegations said to require a mistrial and a full three weeks after Judge Watkins, ruling from the bench at the conclusion of the trial, made findings and dismissed the petitions. The motions for mistrial were filed on or about the same day that DHS filed a motion for reconsideration of the court's dismissal of the petitions—again, three weeks after the court so ruled. The presiding judge declined the children's request that the motions for mistrial be reassigned to another judge, and Judge Watkins denied the motions in due course.

A motion for mistrial must be timely made to preserve the issue for appeal. *State v. Walton*, 311 Or 223, 248, 809 P2d 81 (1991) (citing *State v. Montez*, 309 Or 564, 691, 789 P2d 1352 (1990)). Although mother agrees that the claims of error directed to the motions for mistrial were preserved, "we have an independent obligation to assess preservation, regardless of what position the parties take." *State v. Taylor*, 323 Or App 422, 427 n 3, 523 P3d 696 (2022).

A motion made at the time of the events that give rise to the motion for mistrial is timely because "[t]he purpose behind requiring an immediate mistrial motion is to allow the court to take prompt curative action if the court believes it is warranted." *State v. Veatch*, 223 Or App 444, 453, 196 P3d 45 (2008). A motion for mistrial may also be deemed timely "even if not instantaneously made, when made under such circumstances that 'the underlying purpose of that preservation requirement is fulfilled'" in the particular case. *State v. Cox*, 272 Or App 390, 405, 359 P3d 257 (2015) (quoting *Veatch*, 223 Or App at 453-54). We take a "nuanced approach" to assessing the timeliness of mistrial

motions that considers a number of factors with a view to ensuring that the foundational principles of the preservation requirement were met. *State v. Sprow*, 298 Or App 44, 49, 445 P3d 351 (2019). Those factors include how much time elapsed between the allegedly objectionable basis for the motion and the objection itself; whether additional testimony was heard, evidence was received, or issues were discussed; whether the trial court and nonmoving party were aware of the moving party's objection; whether the moving party may have made a strategic choice in delaying the mistrial request; whether the trial court had an opportunity to take prompt curative action; and whether the nonmoving party objected to the mistrial motion as untimely. *Id.* at 49-50.

Applying those factors to this case, we readily conclude that the underlying purposes of the timeliness requirement were not met. The motions seeking a mistrial were filed 21 days after the trial concluded. Although the children's attorneys asserted that the motions were timely "because some of the information contained in the declaration and affidavit was not realized or discovered until after the conclusion of the trial," the facts alleged in support of the motions occurred on the first three days of trial and were witnessed by individuals available to and cooperative with the children's counsel and by the children's counsel themselves. Further, the motions did not explain precisely which information was not realized or discovered until after trial or precisely when those facts became understood by or known to counsel, aside from the vague assertions that "some" of the information was not discovered until "after" the trial concluded three weeks earlier.

Even assuming that the only facts known to counsel during trial were those relating to the court's statement regarding the hypothetical posed to Duncan, counsel did not object at that time or otherwise make the objection known to the court during the remainder of the trial in which testimony from eight additional witnesses was heard, nearly a dozen exhibits were received, several legal issues were discussed, and judgment was rendered. Counsel no doubt made strategic choices as the trial unfolded but, given the sequence

of events and the amount of time that passed between the statement that allegedly made the judge a witness in the proceeding and the court's dismissal of the TPR petitions, the timing of the ultimate motions for mistrial fatally compromised the court's ability to take prompt curative action.

Our conclusion that the motions were untimely would normally preclude our review of the claimed errors absent a request for plain-error review. *See* ORAP 5.45(1). However, the focus of the motions for mistrial was whether the proceeding was fundamentally fair given that the judge was allegedly not neutral, as required by due process. We have held that, "to ensure due process, a judge's *actual or apparent* bias must by necessity result in disqualification, even when the statutory requirements for recusal have not been, or *** could not have been followed." *State v. Garza*, 125 Or App 385, 388-89, 865 P2d 463 (1993), *rev den*, 319 Or 81 (1994) (emphasis in original); *see also Lamonts Apparel, Inc. v. SI-Lloyd Associates*, 153 Or App 227, 235, 956 P2d 1024 (1998) (explaining that the statutes governing procedures to disqualify a judge "are irrelevant to whether later events require recusal as a matter of law"). Of course, *Garza* and *Lamonts Apparel, Inc.* were cases in which motions to disqualify the judge were actually made during trial, and they are distinguishable for that reason. We nevertheless proceed to review the court's denial of the motions for mistrial here because judgment had not yet been entered when the motions were filed and because the motions raised constitutional questions about the fairness of the trial that would, if meritorious, require the declaration of a mistrial and remand to the juvenile court for further proceedings.

We review the denial of a motion for mistrial for abuse of discretion, a "daunting standard of review that gives the trial court's decision great deference." *State v. Woodall*, 259 Or App 67, 74, 313 P3d 298 (2013), *rev den*, 354 Or 735 (2014). Abuse of discretion occurs only when the effect of the alleged error denies the party a fair trial. *State v. Bowen*, 340 Or 487, 508, 135 P3d 272 (2006).

Here, the first basis of the motions for mistrial was the children's allegation that the juvenile judge engaged in certain "*ex parte* communications," rendering her partial

or biased and that a fair trial was no longer possible. Relying on *Lamonts Apparel, Inc.*, the children argue that mother's "request that Judge Watkins intervene in the actions of another case participant is a communication concerning a pending proceeding" that required the judge to recuse herself.

The children's reliance on *Lamonts Apparel, Inc.* is misplaced. In that case, after a hearing regarding the timeliness of a dispositive motion in which the clerk of court testified as a witness, the trial judge initiated multiple *ex parte* contacts with that witness to discuss facts directly relevant to the timeliness of that pending motion. 153 Or App at 230. The "essential issue" on appeal was whether the alleged *ex parte* contacts, "which the judge initiated, affected his decision on the motion" before the court. *Id.* at 234. We explained that the judge's statement at the hearing on the plaintiff's recusal motion that the contacts did not affect his decision was not and could not be evidence, given that OEC 605 "absolutely forbids" the judge from testifying, subject to cross-examination, as to the factors that went into his decision. *Id.* Because the plaintiff and the judge were "in impossible positions, the judge because he cannot do more than simply state that his contacts did not affect his decision, [the] plaintiff because it cannot effectively challenge those statements," we held that "[t]he only appropriate response to the situation was for [the judge] to recuse himself and to allow a different judge, who had no outside contacts on the subject of the motion *** to decide the motion." *Id.* at 234-35. We thus presumed the *ex parte* contacts were prejudicial because they concerned information relevant to a question of law or fact before the court. *Id.*; *accord Trice v. Baldwin*, 140 Or App 300, 306, 915 P2d 456 (1996) ("We conclude that an undisclosed and improper *ex parte* contact with a judge in a bench trial is presumptively prejudicial when that contact involves information relevant to a question of law or fact before the court.").

By contrast, here the alleged conversation between mother and Judge Watkins did not involve information relevant to a question of law or fact before the court and therefore did not constitute *ex parte* communications. The

children argue that mother's "assertion of misbehavior by a participant in the proceeding \*\*\* would be relevant to the judge's role as factfinder and could influence the judge's factual conclusions." But that is not the standard. The parties do not explain—and the alleged facts do not demonstrate—how mother's alleged complaint about the attorney representing DHS was information relevant to the allegations in the termination petitions pending before the court. Even assuming that the facts alleged in support of the motions for mistrial are true for purposes of deciding whether the juvenile court abused its discretion in denying those motions, those facts do not support that Judge Watkins engaged in *ex parte* communications with mother. Thus, to the extent that *ex parte* communications were the basis of the motions for mistrial, it was not an abuse of discretion to deny the motions.

The children further contend that, "[b]y stating that the hypothetical courthouse security incident facts that [the children's counsel] posed to an expert witness 'are not accurate,' Judge Watkins became a witness in the proceeding" because she "had personal knowledge of disputed facts about what happened with mother at courthouse security." Again relying on *Lamonts Apparel, Inc.*, the children argue that "a judge who had personal knowledge of relevant facts might be acting as a witness, and thus might violate [OEC 605], even if the judge did not formally take the witness stand." 153 Or App at 234. The children argue that they were prejudiced because the children's counsel "would want to offer evidence of the judge's perceptions of the security incident but [wa]s precluded from doing so" due to the bar on the judge testifying as a witness and because the children were denied "the ability to question another witness about the implications of the incident," which "denied children an opportunity to be heard regarding evidence relevant to the issue of mother's conduct." While a closer question, we are not persuaded. The children and DHS still do not explain how the alleged courthouse security incident involved facts *actually* in dispute in the proceeding. To the extent the children and DHS are suggesting that mother's difficulty navigating courthouse security was relevant to the allegations regarding her mental health, we disagree. The test for

parental unfitness focuses on "the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *State ex rel SOSCF v. Stillman*, 333 Or 135, 146, 36 P3d 490 (2001). Further, court staff disclosed to those present in the courtroom that the judge had facilitated mother's transition through courthouse security, and, given that counsel posed the hypothetical about the incident to Duncan when court resumed, it is reasonable to infer that counsel was present during that disclosure. Given that counsel had that information and that it was not relevant to any issue in the case, it is unclear why the security hypothetical was used unless perhaps to create a basis for mistrial. It was therefore not an abuse of discretion to deny the mistrial motions on that basis. Accordingly, we reject children's first through third and DHS's ninth through eleventh assignments of error.

## III.   DISMISSAL OF TERMINATION PETITIONS

DHS's first three assignments of error and the children's fourth through sixth assignments of error challenge the juvenile court's dismissal of the petitions to terminate mother's parental rights as to M, J, and E at the close of DHS's evidence. As we will explain, the evidence in the record does not clearly and convincingly persuade us that mother's mental health conditions are of such nature and degree as to render her incapable of providing proper care for her children. DHS has likewise failed to meet its burden to establish that mother's conduct or conditions are seriously detrimental, rendering her unfit so that termination is warranted. Finally, DHS has not established that mother's lack of stable housing is an independent ground for termination, and it has not advanced or developed arguments that any of the remaining allegations serve as an independent basis on which to terminate mother's parental rights at this time. Accordingly, the juvenile court did not err in dismissing the termination petitions.

We begin with the relevant legal standard. To terminate a parent's rights on the basis of unfitness, a court must find that (1) the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child; (2) integration of the child into the parent's care

is improbable within a reasonable time due to conduct or conditions not likely to change; and (3) termination is in the best interests of the child. ORS 419B.500; ORS 419B.504; *Stillman*, 333 Or at 145-46.

The state must establish the statutory grounds for termination by clear and convincing evidence. ORS 419B.521(1). Evidence is clear and convincing when it "makes the existence of a fact highly probable or if it is of extraordinary persuasiveness." *Dept. of Human Services v. N. H.*, 322 Or App 507, 514, 520 P3d 424, *rev den*, 370 Or 694 (2022). When we review *de novo*, "we are not performing our more typical appellate-court function of assessing whether the evidence before a trial court was legally sufficient to support its ruling." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 52, 515 P3d 927 (2022). Instead, "we are deciding for ourselves whether the case made by the party with the burden of persuasion persuades us that that party has proven its case." *Id.*

In considering whether a parent's conduct or condition is "seriously detrimental," the court "focuses on the detrimental effect of the parent's conduct or condition *on the child*, not just the seriousness of the parent's conduct or condition in the abstract." *Dept. of Human Services v. B. J. J.*, 282 Or App 488, 502, 387 P3d 450 (2016) (emphasis in original; internal quotation marks and citation omitted). However, a condition or conduct can be "seriously detrimental" based on the potential for such harm. *Id.* In each case, the "serious detriment" inquiry is "child-specific" and calls for testimony regarding the needs of the particular child. *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 657, 126 P3d 710 (2006). Finally, in determining whether DHS has proved unfitness, we examine the parent's conduct and conditions at the time of the termination hearing and in combination rather than in isolation. *B. J. J.*, 282 Or App at 503.

DHS argues that it proved by clear and convincing evidence that mother's conduct and conditions are seriously detrimental to the children. In DHS's view, the evidence clearly and convincingly shows that the children were traumatized by mother's chronic neglect, lack of supervision, untreated mental health issues, and damaging treatment

while in mother's care; that mother's mental health conditions and resulting symptoms are harmful to the children, mother lacks insight into that harm, and she has not made strong attempts to correct her behavior; and that the children have significant special needs due in part to the trauma they experienced in mother's care, which mother fails to acknowledge and for which she fails to take responsibility. DHS also argues that mother's housing situation remains unstable despite DHS providing her with years of services, including housing support and referrals. At oral argument, DHS maintained that this is "not a close case" and that the juvenile court's ruling is "inexplicable."

We have reviewed the entire record *de novo* and find that DHS failed to meet its burden to prove mother's unfitness. We begin with the evidence regarding mother's mental health conditions because, at trial, DHS's theory was that "mother's mental health has created all these other conditions" alleged in the termination petitions.

Mother submitted to two neuropsychological evaluations in relation to the underlying dependency proceedings, which DHS submitted as exhibits in the termination trial. In September 2018, Dr. Backstrand diagnosed mother with bipolar disorder and Attention-Deficit/Hyperactivity Disorder (ADHD) and noted that mother displayed characteristics of a personality disorder. Her testing indicated average levels of intellectual functioning and grasp of parenting skills, such as expectations of children, empathy, and family roles, and also indicated that she practices nurturing parenting skills and concepts regularly. Backstrand explained that mother was able to adequately describe her children's needs and has a basic understanding of the knowledge and skills of nurturing parenting but that her ability to recognize and meet the children's needs in practice "appears to be variable." Backstrand observed a visit with the children in which mother exhibited moderate warmth and affection, was generally responsive and engaged in interacting with M, J, and E, offered some encouragement and teaching, and was aware of and redirected some of the children's problem behaviors. However, Backstrand opined that mother's ability to manage stress was poor, evidenced by her emotional

reactivity, aggressive outbursts, and DHS's observations of her difficulty managing the "chaos" in visits with all four children together and her lack of coping skills.[4] Backstrand ultimately opined that mother's mental health "may impede her parenting" without proper treatment, and recommended psychotherapy, particularly Dialectical Behavioral Therapy (DBT), to address mother's emotional regulation, stress tolerance, interpersonal effectiveness, and mindfulness.

In February 2020, Duncan again diagnosed mother with bipolar disorder and ADHD and also noted that she exhibited traits of a personality disorder. Duncan opined that mother continues to experience co-occurring mental health symptoms and maladaptive personality traits and requires mental health treatment to "optimize" her daily functioning and parental capacities. Duncan opined that mother remains prone to becoming dysregulated and reactive "towards DHS personnel, and possibly towards others," despite her ongoing engagement in individual counseling, and that such behavior has negatively interfered with her visits with her children and with their ability to feel safe and supported by her. Duncan opined that mother has had difficulties parenting her children and attending to their needs "when she has been under more considerable stress," she continues to have difficulties regulating her emotions and behavior and receiving and benefitting from feedback from providers, she does not appear to appreciate how her "immature, oppositional, and reactive behavior can negatively impact her young children," and she has not made strong attempts to correct such behavior. Duncan ultimately opined that mother "continues to be at risk for acting in an

---

[4] Backstrand also noted that mother had indicated that "part of her reactivity with the DHS staff members is due to feeling anxious and cornered" and that "repetition and separating instructions into smaller pieces is helpful for her, as well as presenting information in multiple formats." Backstrand explained that "[i]t may be helpful to develop a system in which [DHS] staff members can alert [mother] that there is a concern in her visit and then provide her time to address the situation before intervening or confronting her." That system was not put into place until August 2021 when, after four meetings between DHS, mother, and mother's attorney, DHS agreed to be "as non-intrusive as possible" and to text and email any "non-safety related redirection" after the visit; and to verbally or physically intervene only if (1) mother makes a critical, negative, or hurtful comment to a child, (2) a child is not adequately supervised while engaging in unsafe behavior, or (3) mother talks negatively about a child's other family member or caregiver.

immature, oppositional, and reactive manner in front of her children," and he recommended that she continue individual therapy and consider "more intensive DBT."

At trial, Backstrand testified that mother's diagnoses "definitely could" impact her ability to safely parent, depending on their severity and management, and that there was a "longstanding history" of "multiple reports from multiple sources" of mother's continued emotional reactivity, oppositional attitude, adversarial nature, impulsivity, and inappropriate behavior in front of the children. Duncan testified that mother's mental health impacts her ability to parent "mostly [by] really becoming upset and reactive and d[y]sregulated in front of her kids." Duncan explained that when he evaluated mother in 2020, her diagnosis and symptoms made it difficult for her to be mindful and attuned to her children's needs or to appreciate the extent to which she was impacting them. He described her condition as "chronic" and her prognosis as "poor" because "these are longstanding problems" that require "intensive treatment."

Backstrand testified to a "possibility" that mother suffers from a personality disorder and explained that someone with a personality disorder can safely parent unless they are unaware of or unwilling to meet their children's needs or to put their children's needs above their own, or are endangering them due to being reckless, irresponsible, or inattentive. She opined that it is "good" that mother is engaged in treatment and observed that mother was using skills in the courtroom she most likely learned in DBT classes to control her outbursts, such as channeling her energy and attention into coloring, and that her ability to maintain composure for a considerable amount of time was "encouraging" and "positive." She testified, however, that she would also like to see mother "compliant with DHS requirements," that visits are going well, and that mother's behaviors are "more appropriate, especially around the children."

Duncan testified similarly that, "just because [mother] has those conditions," including trauma symptoms, mood symptoms, and personality features, "doesn't mean she can't parent." Rather, "[i]t means that she has to have adequate treatment and those conditions need to

be well-managed to optimize her parental capacities" and "having those conditions in better remission just optimizes her abilities to parent."

It is obvious that DHS is not satisfied that mother can *optimally* meet her children's needs. To be sure, DHS records confirm that mother's ability to use nurturing parenting skills with her children has been variable. However, our review of the entire record does not persuade us by clear and convincing evidence that mother cannot provide legally adequate care for her children for extended periods of time. *See State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 157, 997 P2d 231 (2000) ("[W]e look beyond the caseworkers' conclusions to the empirical information that supports their opinions."). As Duncan noted, mother's ability to be more attuned to her children's needs may well need to improve in order to optimize her parenting skills, but her skills are currently at the required minimally adequate level. Moreover, despite evidence of mother's open hostility toward DHS and the added stress that comes with that, the evidence overall, including evidence of mother's engagement with services, her conduct during visitation, and the psychological evaluations and testimony, persuades us that mother is both aware of and willing to meet her children's needs.

We also find that, while mother's longstanding conduct of emotional dysregulation in front of—and at times toward—her children is harmful, under these circumstances—and on this record—it does not present a risk of the type of *seriously* detrimental harm to the children that justifies or requires termination of mother's parental rights. *See State v. McMaster*, 259 Or 291, 303-04, 486 P2d 567 (1971) ("The best interests of the child are paramount; however, the courts cannot sever *** parental rights when many thousands of children are being raised under basically the same circumstances ***. The legislature had in mind conduct substantially departing from the norm.").[5] Backstrand testified that the risk of harm to the children related to mother's mental health conditions may manifest in distress,

---

[5] The legislature amended ORS 419B.504 after *McMaster*, but "we and the Supreme Court have continued to rely on the *McMaster* formulation of whether the relevant conduct or condition is 'seriously detrimental.'" *B. J. J.*, 282 Or App at 505 n 9.

decreased self-esteem, and increased anxiety. DHS case-workers testified that the children reacted negatively to mother's dysregulated behavior and showed an increase in emotional dysregulation, aggressive behavior, and signs of stress around visits with mother. However, as the juvenile court observed, it is likely that "many thousands of children are being raised under basically the same circumstances." *See id.* at 304; *see also State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 87, 106 P3d 627 (2005) ("Given mother's limitations, perfection in parenting is not attainable (if it is for anyone), but neither is it required.").

There is certainly evidence in the record that the children have experienced significant trauma and that they have significant trauma-related needs. The evidence, however, does not establish the required link between the children's trauma and related needs and mother's parenting. In other words, the fact that the children have significant, trauma-related special needs does not, without more, prove that mother is an unfit parent, and we are not persuaded on this record that mother is incapable of adequately meeting the children's current needs, particularly with supportive services.

Prior to the incident that led to the children's removal in March 2018, DHS had investigated various allegations involving this family dating back to 2014 and repeatedly judged the family's living conditions to be adequate and concluded that the allegations relating to M, J, and E were unfounded. Medical and school records from before the children were removed from mother's care show that the family was receiving numerous services, the children were adequately fed and cared for, and, although both M and J were involved in special education programs, none of the children exhibited significant troubling behavior. The children's circumstances changed and worsened after DHS removed them from their mother's care in March of 2018. They were placed in separate, nonrelative foster homes where they exhibited difficult and disruptive behavior which, in turn, led to DHS repeatedly moving the children at the request of foster providers. M had eight placements in the first year of care; J had 16 placements in the first 18 months of care, including therapeutic group homes where staff regularly

placed him in security holds; and E had eight placements in the first six months of care, including one home where an older foster sibling disclosed that he sexually abused E multiple times over the course of a few months. Finally, as noted, because mother repeatedly disregarded visit guidelines, her contact with the children was reduced and then suspended altogether.

The record does not convince us that mother's mental health conditions and attendant conduct—even if not optimal for these children—render her parenting skills "so inadequate as to constitute a serious detriment" to the children, rather than rendering her merely unable "to maximize the child[ren]'s potential." *State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 793, 126 P3d 758 (2006). The trauma M, J, and E experienced while in the foster care placements arranged by DHS cannot be attributed to mother on this record. *See Dept. of Human Services v. C. R. P.*, 244 Or App 221, 238, 260 P3d 654, *rev den*, 351 Or 254 (2011) ("DHS is responsible for making decisions regarding the welfare of children in its custody, but the consequences of those decisions should not necessarily be attributed to the parent in every instance.").

We next address DHS's contention that mother's lack of contact with the children at the time of the termination trial establishes that her mental health conditions and attendant conduct have been seriously detrimental to the children. There is no dispute that mother and the children were estranged by the time of the termination trial, nearly four years after the children were removed from mother's care. Mother's relationship with DHS was clearly strained, and she was responsible for part of that dynamic. However, the record shows that mother has consistently attended visits and other meetings throughout the pendency of the cases, has objected to visit restrictions, and has advocated for increased visits with her children and for parent-child interactive therapy, all in an effort to work toward reuniting her family. DHS, for its part, has relied on therapeutic recommendations in making placement, treatment, and visitation decisions. But the fact that these cases are medically and emotionally complex, with particularly difficult personality conflicts that have worked against the agency's efforts,

does not make mother's lack of contact with her children a basis for terminating her parental rights.

Finally, we address the allegation that mother lacks stable housing. DHS argues that mother "refused to engage with numerous housing options and services [that] DHS offered." The record is not entirely clear on where mother has lived throughout the underlying dependency cases. Her DHS caseworker from 2018 to 2020 testified that she had visited mother's home and had no concerns, so it appears that mother was able to secure housing on her own for at least some period of time. Mother reported to her therapist that she had been evicted in November 2021 and that she had reengaged with a county-run clinic to assist her with case management and specifically housing assistance, and she testified that she was living in a hotel at the time of trial. Given her ongoing efforts to secure stable housing to accommodate herself and the children, we are not persuaded that mother's lack of long-term housing is a sufficient independent basis to terminate her parental rights. *Cf. Dept. of Human Services v. M. H.*, 256 Or App 306, 331, 300 P3d 1262, *rev den*, 354 Or 61 (2013) (concluding that "homelessness and unemployment are not, alone, sufficient bases" for dependency jurisdiction).[6]

To summarize, the psychological evidence in the record does not persuade us that mother's mental health conditions are of such nature and degree as to render her incapable of providing proper care for the children for extended periods of time. Further, under the circumstances of this case, neither the ongoing and at times increasing special needs of the children nor mother's lack of contact with them at the time of the termination trial clearly and convincingly establish that mother's emotional dysregulation and reactivity has resulted in or poses a risk of the sort of serious detriment to the children that justifies termination of mother's

---

[6] DHS has not advanced or developed arguments that any of the remaining allegations serve as an independent basis on which to terminate mother's parental rights at this time, and we therefore decline to address them. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

parental rights. If anything, the evidence establishes that mother's mental health conditions impact her ability to cope with the stress of DHS intervention in her family which, in turn, impacts her ability to convince DHS that she can safely parent her children. However, mother does not bear the burden to prove that she is fit; DHS bears the burden of proving, by clear and convincing evidence, that she is unfit. *Cf. State ex rel Dept. of Human Services v. L. S.*, 211 Or App 221, 241, 154 P3d 148 (2007) (recognizing DHS's "difficult position" as to "its ability to contact and work with mother" but noting that "we cannot ignore the requirements of ORS 419B.504"). It has failed to do so.

We acknowledge the difficult position all parties to these cases are in, particularly the children. Mother cannot reasonably expect the children to be returned to her care if she continues to alienate DHS staff and providers. At the same time, DHS has not met its burden to prove that mother's mental health conditions and resulting conduct render her unfit to parent her children. The juvenile court did not err when it dismissed the petitions as to M, J, and E.

## IV.  DISMISSAL WITH PREJUDICE

We proceed to address DHS's and the children's fourth through sixth assignments of error, which challenge the juvenile court's dismissal of the termination petitions with prejudice. We conclude that the juvenile court did not abuse its discretion in dismissing the petitions with prejudice.

ORS 419B.890 authorizes a juvenile court, upon motion of a party, to adjudicate a petition at the close of the petitioner's evidence:

"(1)  After the proponent of the petition has completed the presentation of evidence, any other party, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal of any or all of the allegations of the petition on the ground that upon the facts and the law the proponent of the petition has failed to prove the allegations or, if proven, the allegations do not constitute a legal basis for the relief sought by the petition. The court may order dismissal of the petition or one or more of

the allegations of the petition, or the court may decline to render any order until the close of all the evidence.

"(2) Unless the court in its judgment of dismissal otherwise specifies, a dismissal under this section operates as an adjudication without prejudice."

Consistent with the permissive language of the statute's text, we review the determination to dismiss the termination petitions with prejudice for abuse of discretion. *See State ex rel Dept. of Human Services v. S. P. B.*, 218 Or App 97, 103, 178 P3d 307 (2008) (applying that standard to other petitions filed under the juvenile code).

DHS first contends that the juvenile court's "brief explanation of why it dismissed the petitions with prejudice was not sufficient to support the exercise of discretion" because the court "failed to make a record reflecting its exercise of discretion and did not specifically address why it dismissed the petitions with prejudice." DHS points out that when a trial court renders a judgment of dismissal with prejudice under ORCP 54 B(2), the court is required to make findings under ORCP 62 so as "to provide a reviewing court a basis for determining how and why the trial court concluded that a terminal judgment on the merits was appropriate at the close of the plaintiff's case." *Joseph v. Cohen*, 61 Or App 559, 563, 658 P2d 544 (1983). Although DHS acknowledges that ORS 419B.890 does not require the court to make findings, it argues that the "general purpose still applies."

We first observe that ORCP 54 does not apply to juvenile court proceedings. ORS 419B.800(1) ("ORS 419B.800 to 419B.929 govern procedure and practice in all juvenile court proceedings under this chapter. The Oregon Rules of Civil Procedure do not apply in these proceedings."). Further, nothing in the text of ORS 419B.890 requires the court to make findings at all, much less findings specific to its decision to dismiss with prejudice, and we are not aware of any other provision in the juvenile code requiring the court to make findings under these circumstances. Finally, having considered the juvenile court's ruling in light of the arguments made by the parties on the merits of whether DHS met its burden to prove the allegations in the petitions, we conclude that the court made a sufficient record reflecting

its exercise of discretion. *See State v. Anderson*, 363 Or 392, 404, 423 P3d 43 (2018) (holding that a trial court makes a sufficient record to support a discretionary ruling when the ruling, considered in light of the parties' arguments, demonstrates that the court evaluated the appropriate considerations). Indeed, in its oral ruling, the juvenile court set forth the applicable legal standards, announced findings of fact, and explained how the evidence—or lack thereof—factored into its legal conclusions.

DHS next contends that the juvenile court abused its discretion to the extent that it "intended the dismissal with prejudice to be a sanction for what it viewed as []DHS's failure to make past reasonable efforts to reunify the family." In DHS's view, because it was not required to prove past reasonable efforts in a termination proceeding under ORS 419B.504, the court's reliance on that failure fell outside the range of legally permissible outcomes and constituted an abuse of discretion.

The juvenile court apparently did base its decision to dismiss the petitions with prejudice, at least in part, on its view that "we have failed this mother" and "these children" given that, in its view, DHS had not "done all that it could do *** to reunify this mom with her children and these siblings with each other." However, exercising discretion on such a premise is not legally erroneous. *Cf. Nationstar Mortgage, LLC v. Hinkle*, 321 Or App 300, 311-12, 516 P3d 718 (2022) ("When a trial court's exercise of discretion proceeds from a mistaken legal premise, its decision does not fall within the range of legally correct choices and does not produce a permissible, legally correct outcome."). Although the juvenile court was not required to evaluate DHS's reunification efforts at the termination trial, "DHS's failure to make reasonable efforts may be relevant to the determination regarding integration." *Dept. of Human Services v. D. M. T.*, 239 Or App 127, 140, 243 P3d 836 (2010), *rev den*, 349 Or 654 (2011) (citing *State ex rel Dept. of Human Services v. Keeton*, 205 Or App 570, 583, 135 P3d 378 (2006)). In other words, DHS *is* required to prove in a termination proceeding that integration of the child into the parent's care is improbable within a reasonable time, and its failure to make reasonable

efforts may be relevant to that determination.[7] Thus, the juvenile court did not legally err in assessing whether DHS made past reasonable efforts in deciding whether to dismiss the petitions with prejudice and therefore did not abuse its discretion on that basis.

DHS also contends that the juvenile court abused its discretion because "dismissal with prejudice is not in the best interest of the children," given that "it creates uncertainty about the children's future legal status and whether []DHS would be limited in its ability to refile petitions to terminate mother's parental rights." DHS posits that if it is barred from refiling a termination petition—a legal question on which there is no direct controlling authority—the children could potentially remain wards of the court until their majority.

DHS does not anchor its argument to the specific facts of this case or the particular circumstances of these children. Rather, DHS appears to argue that uncertainty for the child inherent in any dismissal of a petition with prejudice renders such a dismissal an abuse of discretion. DHS correctly observes that, "in cases arising under the Juvenile Code, the interests of the children will always be a relevant, even primary, consideration." *State ex rel Juv. Dept. v. G. A. K.*, 225 Or App 477, 487, 201 P3d 930, *rev den*, 346 Or 157 (2009). However, if we accepted DHS's argument, we would effectively create a categorical rule that alters the plain text of the statute, which expressly allows for dismissal with prejudice. *See* ORS 174.010 (in construing a statute we may not "omit what has been inserted"). This case does not call for us to determine whether or to what extent DHS may be precluded from filing any particular termination petition— aside from refiling the operative petitions currently before us—or from repleading similar allegations or relitigating facts that were presented in this proceeding. Those legal issues may be properly raised in the event DHS files future

---

[7] In the underlying dependency proceeding, a juvenile court must determine whether DHS has made "reasonable efforts *** to make it possible for the ward to safely return home" at dispositional and permanency hearings. ORS 419B.340(1); ORS 419B.476(2)(a). The predicate facts to support a court's reasonable efforts determination must be established by a preponderance of the evidence in the record at the time of the hearing. ORS 419B.310(3)(a)(A).

petitions to terminate mother's parental rights under the specific facts and circumstances that then exist. However, we have recognized that, "[w]hen the best interests or welfare of a child are implicated, the interests protected by claim and issue preclusion may be relegated to a secondary position." *Dept. of Human Services v. T. G. H.*, 305 Or App 783, 797, 473 P3d 591 (2020). Moreover, as mother points out, the dismissal of the termination petitions with prejudice does not disturb the underlying dependency proceedings, which require periodic permanency hearings at which the juvenile court must continually revisit and reevaluate the appropriate permanency plan for each child based on current circumstances. Nor do we understand the dismissal of *these* petitions with prejudice to override other provisions in the juvenile code that allow or require DHS to file a termination petition under certain circumstances.

Finally, to the extent that DHS separately argues that the juvenile court abused its discretion in dismissing the petitions at the close of DHS's case, we disagree. We have cautioned, in the context of ORCP 54 B(2), that the power of dismissal "should be employed sparingly" in order "to avoid unnecessary remands for new trials" given that the "dynamics of *de novo* review present the very substantial risk that a half-tried case will be remanded for a new trial" or "at least, the completion of the trial by way of submission for defense and rebuttal evidence." *Venture Properties, Inc. v. Parker*, 223 Or App 321, 341-42, 356, 195 P3d 470 (2008). However, on this record, the juvenile court did not err in finding that DHS had not met its burden to prove the allegations in the petitions and therefore did not err in exercising its authority to dismiss the petitions at the close of DHS's evidence, as expressly authorized by ORS 419B.890(1).

## V.   REMOTE LOCATION TESTIMONY

Finally, both DHS and the children claim in their seventh assignments of error that the juvenile court erred by "reversing—during trial—an order which granted []DHS's motion to permit Dr. Henry Miller to testify remotely under ORS 45.400." However, as mother points out, the juvenile court did not reverse an order granting Miller's remote testimony *during trial*. Rather, the presiding judge of Clackamas

County issued an order three days *before* the start of trial modifying court operations in response to changing COVID-19 pandemic conditions and providing that all TPR proceedings were to be held in person, that a party could file a motion for remote testimony to be determined by the assigned judge, and that the order superseded all prior inconsistent orders. Two days later—the day the case was assigned to Judge Watkins and the day before trial commenced—the juvenile court informed the parties that the Presiding Judge Order (PJO) had superseded an order from the prior month granting DHS's motion for Miller to testify remotely. DHS does not assign error to the PJO or to the juvenile court's ruling that the PJO superseded that prior order allowing Miller's remote testimony.

To the extent that DHS means to challenge the juvenile court's denial of DHS's renewed motion to allow Miller to testify remotely, asserted on the first day of trial, we need not decide whether the juvenile court abused its discretion in denying that motion, *see State v. M. P.*, 312 Or App 411, 419, 493 P3d 1051 (2021) (explaining that the 2017 amendment to ORS 45.400 "expressly makes the decision whether to allow telephonic testimony in nonjury proceedings a matter of trial court discretion except in specified circumstances"), because DHS has not identified how the alleged error was prejudicial. On appeal, DHS acknowledges that it did not have an active subpoena for Miller's testimony at the time of trial but asserts that "it did not have a mechanism to timely compel [his] attendance at trial," given the timing of the juvenile court's ruling. Again, we reject DHS's contention that the juvenile court rescinded the prior order during trial, and DHS does not explain why it would not have been able to timely serve Miller with a subpoena in the three remaining days of trial "so as to allow the witness a reasonable time for preparation and travel to the place of attendance." ORS 419B.902(1). DHS asserted to the juvenile court that it "no longer ha[d] subpoena power to bring him in" to testify, but also represented that it knew where to serve Miller (Newberg), that it had previously subpoenaed him and later notified him that he was relieved of the duty to appear on the subpoena when the prior order allowed him to appear remotely, but that it had concerns about enforcing

a subpoena should he refuse to appear. Accordingly, given that DHS has not established that it could not otherwise secure Miller's testimony at trial, we reject DHS's and the children's seventh assignment of error.

In their eighth assignments of error, DHS and the children contend that the juvenile court erred when it did not allow them "to make an offer of proof regarding Dr. Miller's testimony." We conclude that the juvenile court did not err. The juvenile court did not exclude Miller's testimony, but rather prescribed the "mode" or form in which that testimony could be taken. *See* ORS 45.010(3) and (4) (providing that oral examination and remote location examination under ORS 45.400 are two of six modes in which the testimony of a witness is taken). Accordingly, DHS has not established that it was necessary to make an offer of proof as to the *substance* of Miller's testimony to preserve its claim that the juvenile court abused its discretion in denying the motion to allow Miller to testify remotely. *See State v. Haugen*, 349 Or 174, 191, 243 P3d 31 (2010) ("Making an offer of proof is ordinarily part of preserving an argument that the trial court erred in *excluding* evidence." (Emphasis added.)); *see also Dept. of Human Services v. M. T. J.*, 304 Or App 148, 158-59, 466 P3d 702 (2020) (noting that the purpose of the rule requiring an offer of proof "is to assure that appellate courts are able to determine whether it was error to *exclude* the evidence and whether any error was likely to have affected the result of the case" (emphasis added; internal quotation marks and citation omitted)). We therefore reject DHS's and the children's eighth assignments of error.

Affirmed.